## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

BARBARA L. PERKINS,

        Plaintiff,

vs.                          No. **CIV 02-1392 MCA/WWD**

ANTHONY J. PRINCIPI,
SECRETARY OF VETERANS AFFAIRS

        Defendant.

### MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on *Defendant's Motion for Judgment on the Pleadings, in Part, and Motion for Summary Judgment and Memorandum Brief in Support Thereof* (Doc. 35), filed January 23, 2004. Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court finds that the motion is due to be granted in part and denied in part.

## I.  BACKGROUND

On November 4, 2002, Plaintiff Barbara L. Perkins filed a *Complaint for Violation of Civil Rights*, (Doc. 1), against Defendant Anthony J. Principi, Secretary of Veterans Affairs, alleging discrimination in violation of the Rehabilitation Act and the Americans with Disabilities Act (count one); discrimination in violation of Title VII (count two); retaliation (count three); and violations of the Privacy Act (count four).  (Doc. 1 at 13-16).  Defendant now moves for judgment on the pleadings in part and for summary judgment.  (Doc. 35). The facts set out below are taken from Perkins's complaint.

Perkins served as a general attorney to the Department of Veterans Affairs ("VA"), Office of General Counsel, from August 1986 until October 2001. From February 2001 until October 2001, Perkins was stationed at the VA Medical Center in Albuquerque, New Mexico. (Doc. 1 at 3). In June 1992, Perkins was diagnosed with major depressive disorder. Despite her disability, Perkins consistently received performance appraisals rating her as "excellent." Additionally in August 1998, April 1999, and September 2000 Perkins received "Recognitions of High-Level Performance" and was twice called by her supervisor, Regional Counsel Gregory Ferris, his best attorney. (Id. at 3-4).

Perkins disclosed her disorder to Ferris on October 7, 1999. Later that month, at the request of co-worker Virgil Lewis, a non-disabled male attorney, Ferris split Perkins's workplace into two sections, physically isolating her and segregating her from her colleagues. (Doc. 1 at 4). According to Perkins, Ferris took this action after receiving faxed messages regarding mental illness. Perkins remained segregated until she took a leave of absence in December 2000. (Id.). During this time, Perkins alleges she was (1) deprived of clerical and support staff; (2) instructed not to open office mail; (3) prevented from selecting or helping to select work-study students, interns, and other employees; (4) presented as Lewis's subordinate; and (5) limited in terms of training, travel, and managerial opportunities. Perkins also contends that from November 1996 until January 2001, Ferris allowed Lewis to provide Perkins's clients with legal services and advice. (Id. at 5-6).

In August 2000, Assistant Regional Counsel Jeanne Morris became Perkins's immediate supervisor. (Doc. 1 at 6). Perkins alleges that between August 2000 and

December 2000, the following occurred: (1) Perkins requested from Morris an accommodation in the form of an assignment of federal-contract case work, which would be less stressful than the employment cases she normally handled, but Morris never addressed the request; (2) Perkins requested nomination to two JAG-sponsored courses that would have prepared her for work in the area of federal contracts, but Morris never responded to this request; (3) Perkins responded to Morris's e-mail soliciting applicants for an Intellectual Property course but never heard back from Morris; (4) Morris failed to respond to Perkins's requests for information on the donated-leave program until it was too late for Perkins to take advantage of the information; (5) Perkins took leave without pay because of her depression and Morris's failure to address her requests for accommodation; and (6) while Perkins was on leave, Morris discussed her depression with a paralegal in Perkins's office and had the paralegal conduct a search of Perkins's office.  (Id. at 6-7).

Perkins further alleges that on or about December 7, 2000, her physician, Dr. Carol Schwarz, at Morris's request, sent Morris an e-mail message identifying Perkins's diagnoses and describing necessary accommodations.  On or about December 8, 2000, Lewis sent a memorandum to Morris stating that he believed Perkins to be manic and on December 11, 2000, Morris, without Perkins's knowledge or consent, contacted Dr. Schwarz to obtain additional information about Perkins's condition. (Doc. 1 at 7-8).  At that point, Dr. Schwarz assured Morris that Perkins was not a danger to others in the workplace.  According to Perkins, because of Morris's actions, on or about December 12, 2000 she became fearful of reporting to work and suffered a severe exacerbation of depression.  (Id. at 8).

3

Thereafter, the VA "engaged in inconsistent and dilatory actions in responding to [Perkins's] requests for accommodation." (Doc. 1 at 8). On December 13, 2000, Perkins applied for disability retirement and on December 20, 2000 contacted an EEO officer to complain of disparate treatment, retaliation, and a hostile work environment. (Id. at 9). On or about February 13, 2001, Perkins filed an administrative complaint of employment discrimination with the VA's Office of Resolution Management, and on or about February 26, 2001 withdrew her application for disability retirement. (Id.).

On or about March 2, 2001, Perkins, on leave since January of that year, informed her supervisors that she could return to work as of March 26, 2001. At the same time, Dr. Schwarz notified Ferris that Perkins could begin with a 20-hour per week work schedule and eventually increase to full time with accommodations. (Doc. 1 at 9-10). However, instead of engaging in the interactive process to determine a reasonable accommodation, the VA, through Veterans Affairs General Counsel EEO Attorney Judith Valois, demanded from Perkins a psychiatric fitness-for-duty exam and repeatedly threatened Perkins with discharge unless she proved her well-being. (Id. at 10). On or about March 26, 2001, Perkins was placed on administrative leave for three months and banned from entering her office. In April 2001, the VA's expert, Dr. Jule Moravec,[1] based entirely on a review of Perkins's withdrawn application for disability retirement, concluded that Perkins was disabled and unable to perform the essential functions of her job. (Id. at 10-11).

---

[1] Dr. Moravec is not a medical doctor but, rather, a psychologist who holds a PhD. (See Doc. 35 at 7; Defendant's Exh. A3 at 1).

On or about July 11, 2001, Perkins's co-workers had the lock on her office credenza drilled out, inventoried the contents of her office, and boxed up her personal possessions. Perkins returned to work on September 4, 2001, but was isolated, deprived of support staff, and prevented from participating in the selection of new support personnel.  (Doc. 1 at 12). Co-workers also circulated an article discussing the possibility of violent manifestations of mentally ill individuals.  VA supervisors took no effective action to remedy the situation. In October 2001, Perkins resigned her position with the VA to accept a position as an Administrative Law Judge with the Social Security Administration in Middlesboro, Kentucky.  (Id. at 12-13).

## II.  ANALYSIS

### A.  Standards of Review

A motion for judgment on the pleadings under Fed.R.Civ.P. 12(c) is treated as a motion to dismiss under Fed.R.Civ.P. 12(b)(6).  Mock v. T.G. & Y. Stores Co., 971 F.2d 522, 528 (10th Cir. 1992).  Dismissal under Rule 12(b)(6) is appropriate only if "'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'"  GFF Corp. v. Associated Wholesale Grocers, Inc., 130 F.3d 1381, 1384 (10th Cir.1997) (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).  "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."  Miller v. Glanz, 948 F.2d 1562, 1565 (10th Cir.1991).  Accordingly, all well-pleaded factual allegations in the complaint are accepted

as true and viewed in the light most favorable to the nonmoving party.  GFF Corp., 130 F.3d at 1384.

Summary judgment under Fed.R.Civ.P. 56(c) "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading. . . ."  Fed.R.Civ.P. 56(e).  Rather, "the adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial."  Id.  Judgment is appropriate as a matter of law if the nonmoving party has failed to make an adequate showing on an essential element of its case, as to which it has the burden of proof at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Lopez v. LeMaster, 172 F.3d 756, 759 (10th Cir. 1999).

In order to warrant consideration by the Court, the factual materials accompanying a motion for summary judgment must be admissible or usable at trial (although they do not necessarily need to be presented in a form admissible at trial).  See Chelates, 477 U.S. at 324. It is not the court's role, however, to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment.  Rather, the Court assumes the evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor.  See Hunt v. Cromartie, 526

6

U.S. 541, 551-52 (1999).

**B.  Jurisdiction**

Defendant moves to dismiss as time-barred those claims based on acts allegedly occurring more than 45 days prior to December 20, 2000, the date on which Perkins first contacted an EEO counselor, as well as those claims based on events occurring after February 12, 2001, the date of her EEO complaint.  (Doc. 35 at 10-12; see also Defendant's Exh. A4).  Defendant contends that each alleged incident constitutes a separate unlawful employment action for which Perkins was required to exhaust her administrative remedies. (Id.).  Perkins counters that all the separate acts of discrimination for which she seeks relief combined to create the hostile work environment to which she was subjected and, accordingly, she properly raises each act under the "continuing violation" theory.  Perkins also notes that she twice amended her EEO complaint, first on April 17, 2001 and again on July 6, 2002.  (Doc. 37 at 3-5).  Both sides rely on National R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002).

In Morgan, the United States Supreme Court held that because each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable unlawful employment practice, a plaintiff raising claims of discrete discriminatory or retaliatory acts must file his or her administrative charge within the appropriate time period.  Morgan, 536 U.S. at 114, 123.  Accordingly, "Morgan abrogates the continuing violation doctrine as previously applied to claims of discriminatory or retaliatory actions by employers[.]"  Martinez v. Potter, 347 F.3d 1208, 1210 (10th Cir. 2003).  However,

7

> [h]ostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct. The "unlawful employment practice" therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own. Such claims are based on the cumulative effect of individual acts.

Morgan, 536 U.S. at 115 (citations and quotations omitted).

The Federal Regulations provide that an aggrieved person who believes he or she has been discriminated against on the basis of, among other things, handicap must consult an EEO counselor prior to filing a complaint in order to try to informally resolve the matter and must do so within 45 days of the date of the matter alleged to be discriminatory or, in the case of a personnel action, within 45 days of the effective date of the action. 29 C.F.R. § 1614.105(a)(1). As stated above, Perkins submits that each of her claims, even those based on incidents occurring more than 45 days prior to her initial consultation with an EEO officer, are actionable because the hostile work environment that these incidents begat amounts to a single unlawful employment practice. (Doc. 37 at 4-5). As explained more fully in Section II D., however, the Court believes that, under the circumstances, Perkins is unable to maintain a claim for hostile-work-environment discrimination. Because each of the discriminatory acts alleged by Perkins must therefore be considered a discrete unlawful employment practice, each was required to have been raised before the EEOC within 45 days of their occurrence. See Morgan, 536 U.S. at 114, 123; Martinez, 347 F.3d at 1210; 29 C.F.R. § 1614.105(a)(1). Accordingly, the Court concludes that those claims arising more than 45 days prior to December 20, 2000, the date on which Perkins first consulted an EEO

counselor, and those claims arising after July 6, 2002, the date on which Perkins filed a second amendment to her EEO complaint, must be dismissed as time-barred, although Perkins may still present these prior acts "as background evidence in support of a timely claim." <u>Martinez</u>, 347 F.3d at 1211; <u>see also</u> <u>Morgan</u>, 536 U.S. at 113; <u>Davidson v. America Online, Inc.</u>, 337 F.3d 1179, 1184 n.2 (10th Cir. 2003).

### C.  Discrimination in Violation of the Rehabilitation Act and the Americans with Disabilities Act

To establish a prima facie case of employment discrimination under the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*, the plaintiff must demonstrate that (1) he or she is disabled under the Act, (2) he or she would be "otherwise qualified" to participate in the program, (3) the program receives federal financial assistance (or is a federal agency), and (4) the program has discriminated against the plaintiff.  <u>McGeshick v. Principi</u>, 357 F.3d 1146, 1150 (10th Cir. 2004).  The standards used to determine violations of the Rehabilitation Act are the same standards applied under the Americans with Disabilities Act (ADA).  <u>Id.</u>  To establish a prima facie case of employment discrimination under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, the plaintiff must show that he or she (1) is disabled within the meaning of the ADA; (2) is qualified, with or without reasonable accommodation, to perform the essential functions of the job held; and (3) was discriminated against because of his or her disability.  <u>Davidson</u>, 337 F.3d at 1188 (quotations omitted).

Defendant has moved for summary judgment on Perkins's Rehabilitation Act claims, arguing that Perkins is not "a qualified individual with a disability," as that term is used in

the Rehabilitation Act, and even assuming Perkins could be defined as such, the VA made reasonable accommodations for her "when she was given paid leave from November 21, 2000, until September 4, 2001, due to her mental disability." (Doc. 35 at 2, 16-18). According to Defendant, Perkins's December 13, 2000 filing of an application for disability retirement serves as an admission that she was unable to perform the essential functions of her job and that no accommodation was possible.  (Id. at 17).  Defendant also argues that "when [the VA] had [Perkins] evaluated several months later by its own psychologist, Dr. Jule Moravec, he concurred with Perkins's psychiatrist (Dr. Schwarz) that she was disabled in such a manner that she could not perform her job."  (Id.).  Finally, Defendant argues that it made reasonable accommodations for Perkins when it allowed her to take leave.  (Id. at 17-18).

The Supreme Court has rejected the idea that pursuit and receipt of Social Security Disability Insurance (SSDI) benefits automatically precludes the claimant from later initiating suit under the ADA.  Cleveland v. Policy Mgt. Sys. Corp., 526 U.S. 795, 797 (1999).  The Court reasoned that the ADA and the Social Security Act (SSA) could co-exist because, unlike the former, the latter does not contemplate that a disabled claimant may nevertheless be able to perform the essential functions of his or her job with reasonable accommodations.  Id. at 803.  Indeed, "when the SSA determines whether an individual is disabled for SSDI purposes, it does *not* take the possibility of 'reasonable accommodation' into account, nor need an applicant refer to the possibility of reasonable accommodation when she applies for SSDI."  Id.  (emphasis in original).  On the other hand, a plaintiff must

"proffer a sufficient explanation" for a previously made, sworn assertion in an application for disability benefits that would appear to negate an essential element of an ADA case.  Id. at 806.

In this case, Perkins's December 13, 2000 application for disability retirement asked the following question: "4. Has reasonable effort for accommodation been made?" (Defendant's Exh. A8, "Agency Certification of Reassignment and Accommodation Efforts," at 6).  Immediately below are two check marks in the box preceding the following: "No, the medical evidence presented to the agency shows that accommodation is not possible due to severity of medical conditions and the physical requirements of the position."  (Id.).  While on its face this statement would appear to negate an element of Perkins's case, namely that she be able to perform the essential functions of her job with reasonable accommodations, Perkins explained the apparent contradiction in deposition testimony when she stated that she withdrew her application February 26, 2001 because she "felt better,"  even though she still considered herself to be disabled within the meaning of the Rehabilitation Act. (Defendant's Exh. A1 at 67, 69).  Perkins's improved condition is also corroborated by the deposition testimony of Dr. Schwarz, who verified that new medication helped to energize Perkins, making her determined to return to work.   (Plaintiff's Exh. P16 at 31-32). Consequently, Defendant's assertion that Perkins's application for disability retirement serves as a concession that Perkins was unable to perform the essential functions of her job is not well-taken.

Defendant next argues that, even assuming Perkins is disabled within the meaning of

11

the Rehabilitation Act, it made reasonable accommodations for her disability by placing her on administrative leave.  (Doc. 35 at 17-18).  The record in this case reflects that on March 2, 2001, Dr. Schwarz sent Greg Ferris a letter in which she noted Perkins's steady improvement and anticipated that Perkins would be able to return to work as of March 26, 2001.  Dr. Schwarz recommended that Perkins begin with a 20-hour work week, expecting that she would eventually be healthy enough to work a full-time schedule.  (Defendant's Exh. A18).  Dr. Schwarz's letter was followed by one from Fred Abramowitz, Perkins's attorney at the time, to Judith Valois, requesting the following accommodations: (1) full-time status with a 20-hour work week, these hours to be increased when deemed appropriate by a treating physician; (2) resumption of Perkins's duties as medical center liaison; (3) reduction in number of unemployment-law cases; (4) no assignment to cases with which Virgil Lewis was involved; and (5) no further supervision by Jeanne Morris.  (Defendant's Exh. A17).  On March 21, 2001, Valois wrote back to Abramowitz, requesting additional information and proposing that "[w]hile we are sorting all of this out," Perkins be placed on paid administrative leave for three weeks, beginning March 26, 2001.  (Defendant's Exh. A10).

Shortly thereafter, in a letter dated April 12, 2001, Valois wrote Perkins that, based on Dr. Moravec's assessment that "you are unable to perform the essential functions of your position without incurring a high probability of substantial harm," Perkins was not to return to work.  Dr. Moravec apparently made this assessment without having examined Perkins.  (Plaintiff's Exh. P12).  Rather, Dr. Moravec's evaluation, which is dated one day after Valois's letter to Perkins, was based on  a review of "a number of documents," among them

letters from Dr. Schwarz and Perkins's treating physician from 1992 through 1995. (Defendant's Exh. A3).

"It is well established both by the statutory language and Supreme Court decisions interpreting the [Rehabilitation] Act that federal employers have greater duties to accommodate disabled workers . . . than the duties owed by federal grantees . . . or those owed by employers under the ADA." Woodman v. Runyon, 132 F.3d 1330, 1343 (10th Cir. 1997). Defendant argues both that it made reasonable accommodations for Perkins by placing her on leave from November 21, 2000 until September 3, 2001, and that reasonable accommodations were not necessary because Perkins was not an otherwise qualified individual with a disability. (Doc. 35 at 16-18). Perkins counters that preventing a disabled employee from returning to the workplace does not constitute a reasonable accommodation. (Doc. 37 at 20). The Court has already determined that Perkins's application for disability retirement does not amount to an admission that she was unable to perform the essential functions of her position. The Court also notes the conflicting medical testimony of Drs. Schwarz and Moravec as to Perkins's ability to perform. Accordingly, viewing the evidence in the light most favorable to Perkins, the Court finds that material factual issues exist as to whether reasonable accommodations were possible and, if so, whether Defendant took appropriate steps to effect them. See Woodman, 132 F.3d at 1343.

### D.  Discrimination in Violation of Title VII

Perkins appears to advance two theories in support of her claim for discrimination in violation of Title VII.  In her complaint, Perkins alleges that she "was treated less favorably

13

than her male counterpart in violation of § 703(a) of Title VII . . . and . . . that . . . the effect of Defendant's unlawful employment practices has been to limit, classify and discriminate against females . . . ."  (Doc. 1 at 14).  In her response to Defendant's motion for judgment on the pleadings and for summary judgment, however, Perkins clarifies that while she "is not maintaining a claim for hostile environment sexual harassment, she has made a claim for hostile work environment disability . . . [which t]his Court has held . . . may be upheld under the Americans with Disabilities Act as well Title VII."  (Doc. 37 at 4).  Because it is not entirely clear whether Perkins is alleging that Defendants tolerated a hostile work environment based on disability in violation of the ADA, Title VII, or both, the Court addresses the viability of Perkins's claim under both statutory schemes.

In support of her argument on this point, Perkins cites E.E.O.C. v. MTS Corp., 937 F.Supp. 1503 (D.N.M.1996) (Doc. 37 at 3-11).  MTS Corp. involved hair stylist Tommy Brasher's allegations that, in violation of the ADA, the owners of the salon for which he worked retaliated against and ultimately terminated him because he suffered from AIDS. MTS Corp., 937 F.Supp. at 1507-09.  While the MTS Corp. court relied on the seminal Title VII cases of Meritor Sav. Bank v. Vinson, 477 U.S. 57(1986) and Harris v. Forklift Sys. Inc., 510 U.S. 17 (1993) for the definition of hostile-work-environment harassment, the court did not hold that a disability-based claim for such harassment is sustainable under Title VII. Rather, the MTS Corp. court held that factual questions existed as to whether the

complained-of atmosphere was sufficiently hostile to constitute harassment under the ADA.[2]
Id. at 1511-12.

To date, only the Fifth Circuit appears to have squarely held that a disability-based hostile-work-environment claim may be brought under the ADA.  See Flowers v. Southern Reg. Physician Svcs. Inc., 247 F.3d 229, 234 (5th Cir. 2001) ("We conclude . . . that the purposes and remedial frameworks of the two statutes [Title VII and the ADA] . . . command our conclusion that the ADA provides a cause of action for disability-based harassment."). Consequently, while the Court appreciates that at least one district court within the Tenth Circuit appears to have recognized such a claim,[3] the Court in this case is constrained by the appellate court's deferral when presented with this precise issue.  See Steele v. Thiokol Corp., 241 F.3d 1248, 1252 (10th Cir. 2001) (given the pertinent facts, declining to decide whether a hostile work environment claim is viable under the ADA). Additionally, to the extent that Perkins is alleging a hostile work environment based on disability in violation of Title VII, the Court finds that such a claim is not cognizable.  See Cisneros v. Wilson, 226 F.3d 1113, 1132 (10th Cir. 2000) (explaining that, because Title VII prohibits an employer from retaliating against an employee who has filed a charge of race-, color-, religion-, sex-, or national origin-based discrimination with the EEOC, plaintiff, who had alleged age and

_____

[2]  The Court notes that a Title VII claim was not before the MTS Corp. court.  The allegations in that case revolved around claims for violations of the ADA, as well as the state-law torts of civil conspiracy; intentional infliction of emotional distress; negligent misrepresentation; negligent retention, supervision and training; and prima facie tort.

[3]  See McClain v. Southwest Steel Co., Inc., 940 F.Supp. 295, 301 (N.D.Okl.1996).

disability discrimination, could not state a claim for retaliation under Title VII) (overruled on other grounds).

### E.  Retaliation

In order to establish a prima facie case of retaliation, a plaintiff must show (1) protected employee action; (2) adverse action by an employer either after or contemporaneous with the employee's protected action; and (3) a causal connection between the employee's action and the employer's adverse action.  Doebele v. Sprint/United Management Co., 342 F.3d 1117, 1135 (10th Cir. 2003) (quotation omitted).  Once a prima facie case is shown, the employer has the burden of producing evidence of a nondiscriminatory reason for its action.  Id.  Thereafter, the plaintiff must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered were not the employer's true reasons but, rather, a pretext for discrimination.  Id.

The evidence in this case shows that on December 20, 2000, Perkins contacted an EEO officer to complain of gender- and disability-based harassment, reprisal for earlier EEO activity, and failure to accommodate.  (Defendant's Exh. A4; Doc. 39, Exh. P1 at 1).  The EEO complaint was twice amended, first on April 7, 2001 and next on  July 6, 2001.  (Id.).  The evidence further demonstrates that, despite Dr. Schwarz's March 2, 2001 letter to Greg Ferris confirming that she was improving and would soon be able to perform the full duties of her position, Perkins was placed on administrative leave for three weeks.  (Defendant's Exh. A10).  Additionally, in a memorandum from Virgil Lewis to Greg Ferris dated April 4, 2001, Lewis, in response to Ferris's "request[ for] specifics on actions of Ms. Perkins,

16

which may be considered hostile[,]" provided 18 examples of Perkins's "hostility."

(Defendant's Exh. A14 at 2).  Lewis's memorandum closes with the following assessment:

> I am concerned that what I had originally perceived as jealousy and/or
> protection of turf is in fact a serious mental instability.  I believe that the
> irrational responses and actions of Ms. Perkins could translate into physical
> harm for the staff of our office.  That includes me.  The fact that she has
> required hospitalization (commitment?) for her condition further strengthens
> my belief that depending on her level of decompensation, she could be a
> danger to any one she perceives as a threat.

(Id.).  As discussed above, in a letter dated April 12, 2001, Valois instructed Perkins not to

return to work, based on Dr. Moravec's assessment that "you are unable to perform the

essential functions of your position without incurring a high probability of substantial harm."

(Plaintiff's Exh. P12).

In light of the foregoing, the Court finds that Perkins has satisfied elements (1) and

(2) of her prima facie case.  See Doebele, 342 F.3d at 1135.  The Court further finds that the

span of time between Perkins's protected activity and Defendant's above-described conduct

is such that a jury could reasonably draw a retaliatory inference.  See Wells v. Colorado

Dept. of Transp., 325 F.3d 1205, 1217 (10th Cir. 2003).  Defendant appears to proffer

worker safety as the legitimate, nondiscriminatory reason for its actions.  (See Doc. 35 at 7,

¶ 28, 15 n.4; Defendant's Exh. A3).  The Court, however, concludes that material factual

issues exist as to whether this reason was merely pretextual, particularly in light of the fact

that Dr. Schwarz, a medical doctor who had personally treated Perkins for an extended

period of time, had assured Jeanne Morris that Perkins posed no danger to herself or others.

(Defendant's Exh. A16).

**F.  The Privacy Act of 1974**

The Privacy Act of 1974 limits the circumstances under which government agencies may disclose information contained in their records. The Act provides, in part, that "[n]o agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains . . . ." Pippinger v. Rubin, 129 F.3d 519, 528 (10th Cir. 1997) (quoting 5 U.S.C. § 552a(b)). Perkins contends that Defendant violated her rights under the Privacy Act when it accessed her December 11, 2000 application for disability retirement and forwarded that material to Dr. Moravec.  (Doc. 1 at 12).  In support of its argument for summary judgment on these claims, Defendant asserts that (1) Perkins consented to disclosure, (2) the application was released for a routine use, and (3) Dr. Moravec had a need to know the information included in the application.  (Doc. 35 at 19-24).

The Court finds Defendant's first argument to be without merit.  According to Defendant, Perkins's consent to the release of information contained in her application for disability retirement can be inferred from her having signed the document, knowing that it included the following Privacy Act Statement:

> Solicitation of this information is authorized by the Civil Service Retirement law . . . and by the Federal Employees' Retirement law . . . . The information you furnish will be used to identify records properly associated with your application for Federal benefits, to obtain additional information if necessary, to determine and allow present or future benefits, and to maintain a uniquely identifiable claim file. The information may be shared and is subject to verification . . . with national, state, local or other charitable or social security

18

administrative agencies in order to determine benefits under their programs, to obtain information necessary for determination or continuation of benefits under this program, or to report income for tax purposes. It may also be shared and verified . . . with law enforcement agencies when they are investigating a violation or potential violation of the civil or criminal law . . . .

(Defendant's Exh. A8 at 9).  A review of the plain language of this statement, however, leads to the conclusion that Perkins consented to disclosure of the disputed information for purposes related to the pursuit of retirement benefits.  Additionally, there is no evidence that Perkins provided prior written consent with respect to the disclosure.  See 5 U.S.C. § 552a(b).  Accordingly, the Court rejects Defendant's first argument.

The "routine use" exception to the Privacy Act's general prohibition against unauthorized disclosure states that "the term 'routine use' means, with respect to the disclosure of a record, the use of such record for a purpose which is compatible with the purpose for which it was collected."   5 U.S.C. § 552a(b)(7).  The "routine use" exception "permits far more disclosure of records than does the 'need to know' exception," which allows for disclosure to those officers and employees of the record-maintaining agency with a need for the record in the performance of their duties.  Pippinger, 129 F.3d at 531; 5 U.S.C. § 552a(b)(1).  Agencies that maintain a system of records must publish in the Federal Register a notice of "each routine use of the records contained in the system, including the categories of users and the purpose of each use." 5 U.S.C. § 552a(e)(4)(D).  Furthermore, records may be disclosed under the "routine use" exception only "under a routine use published . . . for the system of records covering [the disclosed] records." 5 C.F.R. § 293.406 (1997).

19

The parties dispute the exact contours of the "routine use" exception.  Perkins submits that there must be a clearly defined nexus between the purposes of information collection and release, such that disclosure of her disability-retirement application should only have been made for purposes related to federal retirement benefits.  (See Doc. 37 at 22-23).  Perkins thus argues that the disclosure of her application was not for a purpose compatible with the purpose for which the information within was collected.  (Id. at 22).  Defendant counters that disclosure is supported by that "routine use," published in the Federal Register, allowing for release "when necessary to obtain information relevant to an agency decision to hire or retain an employee."  (Defendant's Exh. A23 at 17; Doc. 45 at 15).

"In keeping with Congress's policies embodied in the Privacy Act and its legislative history, the agency should narrowly define routine uses, and permit disclosure only when justified by a substantial public interest."  Andrews v. Veterans Admin., 613 F.Supp. 1404, 1413 (D.Wyo. 1985).  Likewise, when construing regulations, courts "should narrowly interpret routine uses, pursuant to Congress's intent . . . ."  Id.  In this case, Defendant argues that release of Perkins's disability-retirement application was necessary to determine whether (1) she could be accommodated, (2) she could be retained as an attorney, and (3) her return to work at the VA would pose a risk to herself or her co-workers.  (Doc. 35 at 24).  The Court is not convinced that disclosure of Perkins's application for these reasons was compatible with the purposes for which the information at issue was collected.  See 5 U.S.C. § 552a(7).  As stated in the Privacy Act Statement, the information supplied by Perkins was being collected for purposes of determining her eligibility for retirement benefits.

(Defendant's Exh. A8 at 8).   Additionally, the record reflects that months before it was disclosed to Dr. Moravec, Perkins withdrew her application because she felt better. (Doc. 1 at 9, 12; Defendant's Exh. A1 at 67).   Consequently, the Court is not persuaded that the complained-of disclosure falls under the "routine use" exception.

Defendant's final argument concerns the "need to know" exception.   This exception permits the disclosure of otherwise protected information "to those officers and employees of the agency which maintains the record who have a need for the record in the performance of their duties . . . ." 5 U.S.C. § 552a(b)(1).   It is not disputed that Dr. Moravec was an agent of Defendant.   (See Doc. 1 at 11; Doc. 35 at 22).   What is less clear, however, is what, if anything, Dr. Moravec, a psychologist who had never personally evaluated Perkins, needed to know, particularly when that information was available from Dr. Schwarz, a medical doctor who had been Perkins's treating physician for several years.   Accordingly, the Court finds that material factual issues on this point preclude the entry of summary judgment.

## III.  CONCLUSION

For the foregoing reasons, the Court concludes that ***Defendant's Motion for Judgment on the Pleadings, in Part, and Motion for Summary Judgment and Memorandum Brief in Support Thereof*** (Doc. 35) is due to be **GRANTED IN PART** and **DENIED IN PART.**

**IT IS, THEREFORE, ORDERED** that the motion is **GRANTED** with respect to those claims arising more than 45 days prior to December 20, 2000 and with respect to those claims arising after July 6, 2002.

**IT IS FURTHER ORDERED** that the motion is **DENIED** with respect to Perkins's claims for discrimination in violation of the Rehabilitation Act and the ADA (count one).

**IT IS FURTHER ORDERED** that the motion is **GRANTED** with respect to Perkins's claims for discrimination in violation of Title VII (count two).

**IT IS FURTHER ORDERED** that the motion is **DENIED** with respect to Perkins's claims of Retaliation in violation of the Rehabilitation Act (count three).

**IT IS FURTHER ORDERED** that the motion is **GRANTED** with respect to Perkins's claims of Retaliation in violation of Title VII (count three).

**IT IS FURTHER ORDERED** that the motion is **DENIED** with respect to Perkins's claims under the Privacy Act of 1974 (count four).

**SO ORDERED** this 25th day of May, 2004, in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
United States District Judge

22