# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

**BARBARA L. PERKINS**,

      Plaintiff,

vs.                                 No. **CIV 02-1392 MCA/WDS**

**ANTHONY J. PRINCIPI,**
**SECRETARY OF VETERANS AFFAIRS**,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** came before the Court on a bench trial held August 2, 2004, through August 6, 2004, and Defendant's oral motion for judgment as a matter of law, Fed.R.Civ.P. 52(c).  Having considered the evidence admitted at trial, the arguments of counsel, the relevant law, and being fully advised in the premises, I find in favor of Plaintiff Barbara Perkins on her claims for failure to accommodate, disparate treatment, and retaliation in violation of the Rehabilitation Act, 29 U.S.C. § 701 *et seq*.  On the remaining claims, I find in favor of Defendant.  Pursuant to Fed.R.Civ.P. 59(a), I now enter Findings of Fact and Conclusions of Law.[1]

---

[1]  In a prior ruling issued May 25, 2004, I limited Perkins' claims to those that arose no more that 45 days prior to December 20, 2000 ( the date on which Perkins first consulted an EEO counselor) and no later than July 6, 2001.  The *Memorandum Opinion  and Orde*r of May 25, 2004, inadvertently noted the date as "July 6, 2002" instead of "July 6, *2001*."

Plaintiff Barbara Perkins was first diagnosed with major depression and dysthymia in 1992. Despite the diagnoses she carried, Perkins successfully practiced law as a senior attorney with the United States Department of Veterans Affairs for 15 years, beginning in 1986 and continuing until October 2001 when she accepted an appointment as an Administrative Law Judge with the Social Security Administration. At all relevant times, Perkins was employed as an attorney at the Veteran Affairs Medial Center ("VA" or "Medical Center") in Albuquerque, New Mexico.

Throughout her tenure at the VA, Perkins consistently earned exceptionally high marks on her job-performance evaluations. She was referred the more complex cases to work on and was considered by her supervisors as one of the Agency's best lawyers. She received numerous special contribution awards in recognition of her exceptional work. At no time during her employment at the VA was Perkins ever disciplined or charged with misconduct, nor was she the subject of any type of grievance initiated by a supervisor or co-worker.

Over the many years of her service, Perkins' major depression and dysthymia were kept in check by medication and therapy. In July 2000, she began to experience symptoms of depression such that she required sick leave of several days, until November 21, 2000, when she requested leave without pay through December 3, 2000. Despite the onset of symptoms, however, Perkins continued to do good work. Her job-performance evaluation for the period October 1, 1999, to September 30, 2000, noted that "Barbara continues to do

excellent legal work and has represented during this rating period in several significant cases with the Agency prevailing in the end."

It is from Perkins' November 21, 2000, request for leave without pay that began a course of outrageous conduct on the part of her co-workers and supervisors that mocked Perkins and her mental illness and ultimately fostered and created a climate of hysteria and co-worker hostility in the workplace. This outrageous conduct included labeling Perkins as "bipolar" or "manic" and as being a danger to herself as well as to everyone else in the workplace.

Among the most egregious examples of this conduct were the activities of several co-workers who took it upon themselves to search medical literature in an attempt to "diagnose" Perkins. These co-workers located a list of symptoms in the *Diagnostic and Statistical Manual of Mental Disorders* (DSM) that related to a condition known as "bipolar illness." Believing that Perkins fit the definition of this illness, they proceeded to label her as such. But this misguided and misinformed attempt at labeling Perkins as manic or bipolar did not end with their DSM "diagnosis." Rather, one of these co-workers believed in her own mind that persons with bipolar illness are capable of committing murder. The co-worker's source of this belief was her recollection of newspaper articles she had read that reported on persons diagnosed with bipolar illness committing a series of murders in New Mexico. With this association, this co-worker irrationally became terrified of Perkins, believing her capable of murder. Yet another co-worker and professional colleague of Perkins labeled her as

"manic" and "dangerous." He so concluded based upon his self-described "handling of enough tort claim cases to realize how dangerous such individuals can be." These attitudes permeated and infected the workplace.

It is undisputed that Plaintiff did not suffer from bipolar illness, nor was she ever diagnosed as suffering from such.

It is in the context of this and other conduct on the part of Plaintiff's co-workers and supervisors that the ground-work was laid for the claims of disparate treatment, retaliation, and failure to accommodate that I determine were proven at trial.

## I. FINDINGS OF FACT

### Perkins' Qualifications and Performance of Duties

1. Plaintiff Barbara Perkins is a citizen of the United States and, during her employment with Defendant, was a resident of Albuquerque, New Mexico. [Stipulated by parties].

2. Perkins is licensed to practice law in North Dakota, Minnesota, and New Mexico. [Trial testimony of Barbara Perkins].

3. Defendant is head of the Department of Veterans Affairs, a federal department or agency as defined by 5 U.S.C. § 105, 5 U.S.C. § 551, and 29 U.S.C. § 791. [Stipulated by parties].

4. Perkins was an employee of Defendant as defined by the Rehabilitation Act and the Privacy Act. [Id.].

5. Perkins served as general attorney to the Department of Veterans Affairs, Office of

General Counsel from August 1986 until October 2001.  [Id.].

6.      Perkins was first diagnosed with major depression and dysthymia in 1992.  Despite the diagnoses she carried, Perkins practiced law as a senior attorney with the Department of Veterans Affairs for 15 years.

7.      Over the many years of her service, Perkins' major depression and dysthymia were kept in check by medication and therapy.

8.      From February 1991 until October 2001, Perkins was employed as an attorney at the VA in Albuquerque. [Stipulated by parties].

9.      In August 1995, the Albuquerque office where Perkins worked became a satellite office under Defendant's Regional Counsel Office in Phoenix, Arizona.  [Id.].

10.     Regional Counsel Gregory Ferris, stationed in Phoenix, Arizona, was Perkins' first-line supervisor from August 1995 until August 2000 and her second-line supervisor from August 2000 until she left Defendant's employ.  [Id.].

11.     Assistant Regional Counsel Jeanne Morris, also stationed in Phoenix, Arizona, was Perkins' immediate supervisor from August 2000 until Perkins left Defendant's employ.  [Id.].

12.     Perkins' legal work included medical malpractice cases, personnel cases, and all of the legal affairs for the Medical Center.  [Ferris].

13.     While working for the VA, Perkins consistently received excellent performance evaluations and promotions and was never disciplined or charged with misconduct.

[Perkins; trial testimony of Gregory Ferris].

14. Perkins' performance appraisal for the period April 1, 1996 to August 31, 1997 rates her work as "fully successful or better." [Exh. 22].

15. Perkins' performance appraisals for the periods September 1, 1997 to September 31, 1998 and October 1, 1998 to September 30, 1999 rate her as "successful" in case management, client satisfaction, and cooperation and organizational support. [Exhs. 19, 20].

16. Perkins' performance appraisal for the period October 1, 1999 to September 30, 2000 states that "Barbara continues to do excellent legal work and has represented during this rating period in several significant cases with the Agency prevailing in the end." [Exh. 3].

17. Ferris gave Perkins a special contribution award, in recognition of her outstanding job performance in each of the five years he supervised her.

18. Ferris had no problem with Perkins as an attorney.

19. In her 15-year tenure with the VA, Perkins was never disciplined for being sharp-tongued, irritable, or for making jokes. Perkins was never disciplined or criticized for missing a deadline or for writing a legal brief that made no sense. [Perkins].

20. Despite her condition and the fact that it occasionally (over many years) caused her to miss work, Perkins was always able to attend appointments, hearings, and conferences. [Perkins].

21.  At no time during her employment at the Medical Center was Perkins ever disciplined.

22.  At no time during Perkins employment with the VA did any co-worker or supervisor ever file a grievance against her.

23.  At the time of the trial, Perkins was employed as an Administrative Law Judge with the Albuquerque, New Mexico Office of Hearings and Appeals, Social Security Administration.  [Perkins].

24.  In June 1999, Gregory Ferris promoted Perkins from a GS-13 attorney to a GS-14 attorney.  [Id.; trial testimony of Gregory Ferris].

25.  According to Ferris:

    a.   Perkins is a very good attorney who did excellent legal work;

    b.   Ferris relied on Perkins for difficult and high-profile cases;

    c.   Perkins was one of Ferris's better attorneys; and

    d.   over the years Ferris supervised her, Perkins received "special contribution awards," which recognized exceptional work.  [Ferris].

26.  Ferris recommended Perkins for the position of Administrative Law Judge and in his recommendation stated that Perkins did excellent legal work.  [Ferris].

27.  Several of Perkins' former co-workers corroborated Ferris' positive assessment of Perkins' work performance.  [Trial testimony of Annabelle Poteat; trial testimony of Jack Sanzari].

28.    Former VA Assistant Human Resources Manager Annabelle Poteat routinely interacted with Perkins, both on the telephone and in person, several times a week. [Poteat].

29.    Poteat trusted Perkins' legal advice and did not doubt Perkins' ability to perform as a staff attorney.  [Poteat].

30.    Former VA Human Resources Director Jack Sanzari has known Perkins for approximately 12 or 15 years.  [Sanzari].

31.    Sanzari described Perkins as extremely competent, available, hardworking, dependable, and a pleasure to work with. Sanzari also stated that Perkins "always took the extra step to do whatever had to be done" and would stay "late in the evening" if they were working on a case or preparing for a hearing.  [Sanzari].

32.    Sanzari relied on Perkins' expertise with respect to employment law matters. [Sanzari].

33.    In a letter dated April 6, 2001, David Graeber, MD, a former colleague of Perkins who had worked with her on hundreds of cases, described Perkins as "exceptionally professional [and] incredibly helpful."  Dr. Graeber also stated that "Ms. Perkins is unanimously seen as a consummate professional and has an excellent reputation with my (and her) colleagues."  [Exh. 12].

34.    Virgil Lewis was an attorney and co-worker of Perkins.

35.    Agnes Dotson was a paralegal in Perkins' office.

36.    On or about 1997 or 1998, Perkins initiated the application process to become an Administrative Law Judge with the Social Security Administration.  The application process is a lengthy one with respect to time and can take several years.  [Perkins].

37.    After completing the application process, Perkins was ranked and placed on an Administrative Law Judge hiring registry in 1999.  [Perkins].

38.    Some time after 1999, a stay was imposed in the Administrative Law Judge selection process relating to class action litigation entirely unrelated to the matters and issues involved in the present case.  [Perkins].

39.    A temporary lifting of the stay occurred in approximately October 2001 and at that time an Administrative Law Judge position was offered to Perkins.  [Perkins].

40.    In October 2001 Perkins accepted a position as an Administrative Law Judge in the Kentucky/Tennessee region.  [Perkins].

**The Nature of Perkins' Illness**

41.    Dr. Carol Schwarz is a licensed medical doctor who specializes in general adult psychiatry and served as Perkins' treating psychiatrist from 1995 until 2001.  [Trial testimony of Carol Schwarz, MD].

42.    Dr. Schwarz earned a medical degree from the University of Maryland, Baltimore. She did a rotating internship at Good Samaritan Hospital in Phoenix and completed a three-year residency program at the University of Michigan in 1974.  Dr. Schwarz then joined the staff at the University of New Mexico School of Medicine.  Dr. Schwarz

took her boards in psychiatry and neurology in 1977. She then entered private practice. [Id.].

43. Dr. Schwarz diagnosed Perkins as suffering from major depressive disorder (DSM-IV 296.3) and dysthymia (DSM-IV 300.4). [Id.].

44. Dr. Schwarz described major depressive disorder as "generally a pretty severe event" during which the individual sleeps a great deal, slows down, becomes immobilized and unable to move or concentrate very well, and shows signs of agitation. [Id.].

45. Dr. Schwarz described dysthymia as a "depressed . . . kind of a dark, sort of discouraged, pessimistic view of life that stays with a person pretty much all the time." [Id.].

46. Prior to beginning therapy with Dr. Schwarz, Perkins received psychiatric treatment from Gerald S. Fredman, MD from June 11, 1992, until September 8, 1995. During that time period, Perkins carried a diagnosis of major depressive disorder, recurrent, moderate (296.32). [Exh. AB].

47. While Perkins may have been irritable during episodes of major depression, she was not hostile and her judgment was very good. [Schwarz].

48. When Perkins first began treatment with Dr. Schwarz, Perkins was taking Prozac. [Id.].

49. Dr. Schwarz and Perkins jointly decided in November 2000 that Perkins should be prescribed Effexor (an anti-depressant medication) because, according to Dr. Schwarz,

Perkins was "deteriorating" around that time.  [Schwarz; Perkins].

50.	Dr. Schwarz described Effexor as "a good medication" because unlike Prozac, it boosts not just serotonin but is also effective in the epinephrine system and possibly in the dopamine system as well.  Dr. Schwarz testified that Effexor has a broad range of chemical effect.  [Schwarz].

51.	Anti-depressant medications take time to work and may take a month or two to become effective.  [Id.].

52.	Dr. Schwarz testified that "over the course of a couple months," Perkins began to do significantly better with Effexor and described the effect of the Effexor on Perkins as "really quite dramatic." [Id.].

53.	Perkins continued to take Effexor throughout the course of her treatment with Dr. Schwarz.  [Id.].

54.	Perkins' supervisors were aware of her mental illness for several years prior to 2000.

**Relevant Time Frame**

55.	From approximately July 2000 through November 2000:

	a.	the quality of Perkins' work began to slip;

	b.	Perkins became less productive; and

	c.	Perkins was less able to keep up with her daily work load.  [Ferris].

56.	Perkins' condition caused her to request sick leave on July 10, 2000.  In an e-mail message dated September 8, 2000, Perkins requested permission to use sick leave to

take Wednesdays off for the next two months.  She also requested sick leave for Monday, October 30, 2000.  On the afternoon of Tuesday, November 21, 2000, Perkins requested leave without pay for the remainder of that day through December 3rd. [Exhs. F, H, L-O]

57. In an e-mail message of November 21, 2000 to Jeanne Morris, Perkins requested approximately one week's worth of leave without pay (LWOP) due to illness.  [Exh. M].

58. In a November 27, 2000, memorandum sent in response to the November 21st message, Morris asked for medical documentation of Perkins' condition, including those functions of her position that Perkins either could not perform or could perform only with accommodation.  [Exh. P; Perkins].

59. Perkins was surprised and shocked at Morris' request for documentation, since Perkins was not asking for any specific accommodations.  [Perkins].

60. According to Amy Taylor, former VA Supervisor of Staffing and Recruitment, Morris' response was not an appropriate reply to a request for LWOP. [Trial testimony of Amy Taylor].

61. In an e-mail message of December 7, 2000, Dr. Schwarz wrote Morris "to address the questions raised in [Morris'] memo to Barbara Perkins."  Dr. Schwarz identified Perkins' diagnoses by name and DSM-IV code and stated that a reduced work schedule of 20 hours per week would be the most therapeutic accommodation the VA

could provide at that time.  [Exh. T].

62.     On December 11, 2000, Morris sent an e-mail to Dr. Schwarz thanking her for her e-mail response of December 7th.     [Exh. T].

63.     In her December 11th message, Morris asked Dr. Schwarz to comment on Perkins' "manic behavior" and to provide a professional opinion as to whether Perkins was a danger to herself or others.  [Exh. T].

64.     VA protocol and procedures prohibited supervisors from contacting an employee's medical provider in order to obtain medical information about the employee without the employee's consent.  [Taylor; Poteat].  Proper procedure dictated that a supervisor who wanted medical information from an employee's medical provider was required to obtain a written release from the employee and then the VA's employee health physician would contact the employee's provider.  [Taylor].

65.     Morris believed that she could contact Dr. Schwarz because she was invited by Dr. Schwarz to ask additional questions.  [Morris].

66.     Dr. Schwarz responded to Morris that same day, assuring her that Perkins was neither bipolar (manic) nor a danger to herself or others, and had no history of manic or out-of-control behavior.  [Morris].

67.     Dr. Schwarz advised Morris that while Perkins had "a strong sense of injustice that sometimes [got] the best of her . . . her thought processes [were] entirely normal." [Morris].

68.     Dr. Schwarz testified that by "strong sense of injustice" she meant that Perkins reacts

very strongly to things she sees as unfair.  Dr. Schwarz also explained that Perkins felt

that the behavior of co-worker attorney Virgil Lewis was "very unfair," which

disturbed Perkins and made her angry.  [Schwarz].

69.     When Perkins learned of Morris' e-mail of December 11th (and its references to her

as exhibiting manic behavior and implying that she posed a danger to herself and co-

workers) she was devastated and did not feel that she could continue at that job.  When

she learned of the e-mail, Perkins experienced  an episode of major depression,

became "phobic" about returning to work, and "was really very, very distressed." [Id.].

70.     Upon learning of  references to her as "dangerous" and possibly a threat or harm to

herself and those in the workplace, the symptoms or effects of Perkins' mental illness

were exacerbated.  She fell into a deep state of depression, she was humiliated, she

was embarrassed, and she suffered emotional distress.

71.     In an e-mail dated December 12, 2000, Morris approved Perkins' request to work a

reduced schedule of 20 hours per week pending disability retirement.  [Exh. V].

72.     As of December 12, 2000, Perkins had not yet applied for disability retirement.

[Perkins].

73.     On December 13, 2000, Morris sent Perkins a memorandum stating that, over the past

four months, she and Ferris had received unsolicited comments about Perkins,

"suggesting unusual, agitated, manic behavior."  [Exh. Y].

74. While Morris did not identify the individuals who made the comments, she confirmed that she and Ferris had discussed those comments with Dr. Schwarz. [Exh. Y; Perkins].

75. Around this same time, Dr. Schwarz sent Perkins a copy of her e-mail exchange with Morris. [Exh. W].

76. Upon learning of Morris' December 11th e-mail to Dr. Schwarz and the accusations contained therein with respect to her alleged erratic behavior, Perkins' visits to Dr. Schwarz increased and she requested LWOP until further notice. [Perkins; Exh. W].

77. According to Dr. Schwarz, the e-mails and "realization that she had been targeted" caused Perkins to feel that she was unable "to go on" and these were factors in Dr. Schwarz's decision to recommend Perkins for disability retirement. [Schwarz].

78. On December 13, 2000, Perkins applied for disability retirement. [Perkins].

79. On December 20, 2000, Perkins contacted an Equal Employment Opportunity (EEO) counselor. [Exh. D].

80. On February 12, 2001 Perkins filed a complaint of employment discrimination. [Exh. D]. The complaint was amended twice thereafter. Judith Valois of the Office of General Counsel in Washington, D.C. was assigned to handle Perkins' case once the complaint was filed.

81. Perkins withdrew her application for disability retirement on February 26, 2001, having begun to feel the beneficial effects of the previously prescribed Effexor.

[Perkins].

82.   Perkins withdrew her disability-retirement application before she gave notice to the VA that she intended to return to work.  [Perkins].

83.   On March 2, 2001, Dr. Schwarz wrote to Ferris that Perkins was steadily improving and would be able to return to work on a 20-hour per week schedule beginning March 26, 2001.  [Exh. AE].

84.   Dr. Schwarz anticipated that Perkins would "soon" be able to perform the full duties of her position.  [Exh. AE].

85.   Also on March 26, 2001, Perkins made the last of three requests for her Official Personnel File (OPF).  [Perkins; Exh. 7].

86.   Perkins had first requested her OPF in December 2000.  [Exh. 7].

87.   On or about April 11, 2001, Perkins received her OPF.  [Perkins].

88.   According to Amy Taylor, it normally took one or two weeks to get an OPF to a requesting satellite-office employee such as Perkins.  [Taylor].

89.   When Morris learned that Taylor had sent Perkins' OPF to Jack Sanzari, Morris became very upset with Taylor for having done so.  [Taylor].

90.   Morris did not know that it was entirely appropriate for an employee to look at his or her OPF.  Morris believed that Perkins might attempt to alter her OPF.  [Taylor].

91.   Morris's concern that Perkins might attempt to alter her OPF was unreasonable under the circumstances.

## The Medical Center as a Workplace

92.   While she was with the VA, Perkins' office was located on the VA grounds in a building referred to by employees as *Building 18*.  [Perkins].

93.   Because of *Building 18*'s proximity to the VA's psychiatric ward, employees with offices therein had expressed security concerns.  [Trial testimony of Agnes Dotson].

94.   Agnes Dotson testified that when the veterans (patients) in the VA's psychiatric ward would become mad or angry, they would "park themselves" in front of her and holler at her.  [Dotson].

95.   *Building 18* had been broken into.  [Dotson].

96.   A veteran once shot himself on a bench while sitting just across from *Building 18*.  [Dotson].

97.   The behavior of the psychiatric patients frightened Dotson.  [Dotson].

98.   Ferris confirmed that assaults and homicides had occurred on the VA grounds.  [Exh. 16].

99.   In October 1999, Ferris relocated Lewis from *Building 18* on the VA Hospital campus into an office in downtown Albuquerque. [Ferris].

100.   After his move downtown, Lewis would return to *Building 18* to retrieve his mail, usually late in the day or after hours.  [Trial testimony of Virgil Lewis].

101.   On one occasion, Lewis entered *Building 18* late in the afternoon while Perkins was in the building by herself and on the telephone. After finishing her call, Perkins ran

17

down the hall toward Lewis and exclaimed that Lewis had an obligation to announce himself.

102.  Lewis felt threatened by Perkins' behavior. [Lewis].

103.  Lewis' reaction of feeling threatened was unreasonable under the circumstances, and within the context of the premises as described above.

104.  That Perkins was somewhat frightened by Lewis' late-afternoon, unannounced entry into *Building 18* was reasonable under the circumstances.

105.  Most times Lewis returned to *Building 18*, he did not encounter problems with Perkins. [Lewis].

### Co-worker Hostility

106.  While Perkins and Lewis became eligible for a promotion from GS-13 to GS-14 status at the same time, Perkins was promoted before Lewis.  Lewis told Ferris that "he was not happy with the fact that [Perkins] was promoted first." [Ferris].

107.  Prior to 2001, Lewis applied for a position with the United States Attorneys Office. Lewis told Ferris that Perkins was "sabotaging" his efforts to secure this new position. [Id.].

108.  Both Lewis and Perkins described their relationship as one that was not collegial.

109.  On December 8, 2000, Virgil Lewis sent Morris an e-mail in which he described Perkins as "manic," "bipolar," and "very ill" and stated a serious concern for his safety and that of the Albuquerque VA staff.  [Exh. S].  Lewis had never previously raised

any concerns about his or anyone else's safety.

110.    In his e-mail of December 8, 2000, Lewis conceded that he was not an expert in mental illness.  He nonetheless professed to "have handled enough tort claim cases and discussed this condition with enough psychiatrists to realize how dangerous these individuals can be in their manic phase." [Exh. S].

111.    Lewis' actions and expressed opinions permeated and infected the workplace and fostered and encouraged a climate of workplace hostility.

112.    A couple of years after Ferris became Perkins' supervisor in 1995, Perkins asked for a different office, one in which she could more adequately meet with clients.  Ferris agreed with the request.  Ferris asked Perkins' co-worker Elaine Gonzales to move out of her front office, which was then assigned to Perkins.  Gonzales was angry about the move, and expressed to Ferris her anger toward Perkins.  [Ferris].

113.    On March 14, 2001, Perkins, through her attorney at that time, made a request for reasonable accommodations.  Just one week later, in an e-mail dated March 21, 2001, Ferris asked Lewis and Dotson to "relate any past behavior on the part of Barbara which cause[d them] concern in the workplace and [to] summarize the things that occurred over the years to cause that concern."  [Ferris].

114.    In the e-mail Ferris sent Lewis and Dotson, he asked them "to summarize those things that have occured [sic] over the years that have caused you concern or fear for your well being, including both physical and non-physical interactions."  [Exh. 9; see also

19

Exhs. AT, 10].

115. Ferris also asked Lewis and Dotson to state any concerns they had about working with Perkins in the future.  [Exh. 9].

116. Valois had asked Ferris to collect these summaries, the purpose of which was to provide VA psychologist Dr. Jule Moravec with a sense of the present office atmosphere and to assist in his determination as to whether Perkins could be accommodated.  [Ferris].

117. While there were other employees in the office who regularly and routinely interacted with Perkins, Ferris elected to solicit information from no employees other than Virgil Lewis and Agnes Dotson.  [Ferris].

118. Ferris described  the Albuquerque office where Perkins, Lewis, and Dotson worked as "dysfunctional" over the course of several years.

119. For several years prior to 2000, Ferris was aware of the personality conflicts involving Perkins, Lewis, Dotson, and Gonzales.

120. Ferris described his assessment of the Albuquerque office as "people had become fed up with each other over there."

121. Lewis complained to Ferris that he believed Perkins tried to sabotage his efforts to secure employment with the U.S. Attorney's office.

122. At all relevant times Ferris knew that Lewis and Dotson did not like Perkins.

123. Dotson's response to Ferris' inquiry, dated April 2, 2001, recounted events dating back

as far as 1991.  [Exh. 10].

124.   Dotson described an incident in 1991 when Perkins became so angry because Dotson had scheduled an 8:30 a.m. meeting that Perkins, after instructing Dotson "in a raised voice" never again to schedule such an early meeting, "left [and] slammed the door so hard all the front windows rattled."  [Id.].

125.   Dotson described Perkins' "immediate disklike" of one colleague and her fury when she learned that other co-workers had taken the colleague to dinner without inviting Perkins.  [Id.].

126.   Dotson also recounted that the disliked colleague had told her that he had called one of Perkins' former supervisors from another job in another state and was told by the supervisor "that he never knew which Barbara would be coming to work the next day." [Id.].

127.   Dotson stated that one time she called Perkins moody.  In response, Perkins "turned on" Dotson, called Dotson "the moody one," "got up from the chair she was sitting in very angrily, picked up the chair about waist high and slammed it on the floor."  [Id.].

128.   Dotson explained that two co-workers had told her "about a time when [Perkins] was married to her first husband that he took her cigarettes away from her and she chased him all over with a broom."  [Id.].

129.   Dotson worked at the VA from 1985 until 2001 and worked with Perkins for approximately 10 years.  [Dotson].

130.    Dotson described her working relationship with Perkins as "at times okay and at times not okay."  [Id.].

131.    Dotson also worked with Virgil Lewis and believed she worked well with him.

132.    Dotson described Perkins as sometimes confrontational, which upset Dotson and caused her to feel stress.  [Id.].

133.    Dotson testified that, at times, Lewis also become angry.  [Id.].

134.    One day, Dotson and co-workers Elaine Gonzales and a "Ms. Molinar" took it upon themselves to search medical literature in order to secure a diagnosis of Perkins' symptoms.  They located a list of symptoms in the *Diagnostic and Statistical Manual of Mental Disorders* that related to a condition known as "bipolar illness."  Believing that Perkins fit the definition of this illness, they labeled her as such.  [Dotson].

135.    This misguided and misinformed attempt to "label" Perkins continued with Dotson then associating persons with bipolar illnesses as capable of committing murder.  Dotson based her belief on her recollection of reading newspaper articles about persons with bipolar illness committing a series of killings in New Mexico.  With this reference, Dotson and others in the workplace became terrified of Perkins, believing that she was capable or murder.

136.    So, too, did this attitude permeate the workplace during all relevant times.

137.    Dotson did not believe that Perkins was depressed; rather, she believed that Perkins was "moody" and "always . . . anxious to give her opinion."  [Exh. 10].

22

138.   Agnes Dotson is neither a psychologist nor a psychiatrist.  [Dotson]

139.   Perkins has never been diagnosed as manic depressive, now known as bipolar disorder, nor does she suffer from this illness.  This is undisputed.

140.   Dotson was unaware that Dr. Schwarz and another psychiatrist, David Graeber, did not consider Perkins a danger to herself or others.  [Dotson; Exh. 12].

141.   Dotson was familiar with Dr. Graeber's work and considered Dr. Graeber believable. [Dotson].

142.   Dotson was unaware that Dr. Moravec was of the opinion that Perkins was not likely to harm others physically.

143.   Had she known that Perkins' psychiatrist and Dr. Graeber did not consider Perkins a danger, Dotson would have changed her opinion of Perkins.  [Dotson].

144.   Lewis responded to Ferris' request in a memorandum dated April 4, 2001.  [Exh. AT].

145.   Lewis's memorandum recounted events dating back to  approximately the time he was hired by the VA in 1994.  [Exh. AT].

146.   Although Lewis very seldom interacted with Perkins once he moved downtown from *Building 18* in October 1999, he nevertheless provided Ferris with a list of 18 instances of what he described as Perkins' "hostile" actions over the course of many years.  [Id.].

147.   Although Ferris did not use the word "hostile" in his e-mail,  Lewis interpreted Ferris's e-mail as a request "for specifics on actions of Ms. Perkins, which may be considered hostile."  [Exh. AT; see also Exh. 9].

23

148.  Lewis described Perkins as, among other things, hostile, confrontational, physically
      aggressive, and threatening.  [Id.].

149.  As an example of Perkins' "hostile" actions and why he was afraid of her, Lewis noted
      that Perkins exercised frequently while at the office and commented on her "bright red
      high top shoes with white socks."  Lewis also described a "large straw hat that looked
      Vietnamese in style."

150.  Lewis concluded his summary with the following:

      *I am concerned that what I had originally perceived as jealousy
      and/or protection of turf is in fact a serious mental instability. I
      believe that the irrational responses and actions of Ms. Perkins
      could translate into physical harm for the staff of our office. That
      includes me. The fact that she has required hospitalization
      (commitment?) for her condition further strengthens my belief
      that depending on her level of decompensation, she could be a
      danger to any one she perceives as a threat.*  [Lewis; Exh. AT].

151.  At no time did Perkins pose a danger to herself or others.

152.  At all relevant times, Dotson and Lewis exhibited an irrational and unreasonable fear
      of Perkins.

153.  The actions of Lewis, Dotson, and Gonzales were motivated by their respective
      personal animosity toward Perkins, and not by any rational or legitimate concerns about
      workplace safety.

**Administrative Action taken by VA**

154.  In or about February 2001, Judith Valois of the VA's Office of General Counsel in

24

Washington, D.C. became involved in the Agency's handling of matters relating to Perkins. [Ferris].

155. Judith Valois became the Agency's counsel for all matters pertaining to Perkins in February 2001 because Ferris and Morris were named as responsible parties in Perkins' EEO complaint, thereby creating a conflict of interest on their part to act simultaneously in the roles of attorneys for the Agency. [Ferris].

156. Ferris described Valois' role as that of an "advisor."  She was given full authority to negotiate, bargain, and speak on behalf of the Agency in matters relating to Perkins. She had full reign as far as the Office of General Counsel was concerned to request and speak for the Agency, to make demands, and make offers of settlement.  [Ferris].

157. Although Valois was given full authority in the Perkins matter, Ferris remained involved in all aspects of decision-making.  In his words, "the buck stopped with me." [Ferris].

158. Because Perkins had made a request for accommodation, Valois' initial actions (in her role as advisor) regarding determining Perkins' status as a qualified individual with a disability were reasonable.

159. However, Valois also served as the Agency's attorney with respect to defending the EEO complaint that Perkins filed.  Although the EEO complaint dealt with the accommodation issue, Valois' continued involvement now placed her in a potential, if not real, conflict of interest in that she, on the one hand, maintained the role of attorney

for the Agency, and on the other hand, had become a fact witness.

160.   The dual or parallel roles assumed by Valois served to cloud the presumption of neutrality with respect to decision-making, and opened the door to potential, if not real, retaliation.

161.   In a letter dated March 14, 2001, addressed to Valois, Perkins' then-attorney, Fred Abramowitz, requested the following accommodations on Perkins' behalf:

  a.   a 20-hour work week while remaining on full-time status, no loss of seniority or grade due to time away from work, and any step increase to which she would have been entitled but for her absence from work;

  b.   resumption of duties as medical center liaison;

  c.   reduction in job duties with respect to *Touhy*, unemployment, EEO, and MSPB cases;

  d.   no assignment to cases on which Virgil Lewis had been involved;

  e.   no further supervision by Jeanne Morris or, in the alternative, supervision by Morris if all substantive interactions between Morris and Perkins took place through personal contact or telephonically; and

  f.   elimination of previously advanced sick leave.  [Exh. AG].

162.   In response and by letter dated March 21, 2001, Valois requested the following from Abramowitz:

  a.   a precise diagnosis of Perkins' condition;

26

b.      information as to the severity of Perkins' condition;

c.      an explanation as to whether Perkins' condition adversely affected a

major life activity and, if so, which one(s); and

d.      that either Dr. Schwarz or another medical provider of Perkins' choice

compare Perkins' medical restrictions with the functions of her job and

advise the VA of which functions Perkins either could not perform or

could perform only with accommodation.  [Exh. AI].

163.    In or about March 2001, Valois determined that it had become necessary to engage an

expert to determine the propriety of Perkins' requested accommodations.  [Ferris].

164.    Dr. Jule Moravec was retained by the VA to make this determination and to advise the

VA as to whether Perkins was able to return to work.  [Ferris].

165.    Ferris knew Dr. Moravec, who was on contract with the VA, on a social basis, but

believed that Dr. Moravec would render an independent determination of the matter.

[Ferris].

166.    Around this time, Perkins discharged her attorney (Abramowitz) and began to represent

herself while she sought other counsel.  [Trial testimony of Judith Valois].

167.    Valois had at least two telephone conversations with Perkins, which were civil and not

adversarial.  [Valois].

168.    Believing that she and Perkins had come to an interim oral agreement as to how to go

about resolving all parties' concerns, Valois sent Perkins a letter dated March 23, 2001,

stating, among other things, that, effective March 26, 2001, Perkins would be placed on administrative leave for a period of three weeks.  [Valois; Exh. AH].

169.   Perkins did not agree with Valois' assessment of their conferences.

170.   Valois asked Perkins to provide additional medical information on or before March 30, 2001.  [Exh. AH].

171.   By letter to Valois dated March 26, 2001, Perkins agreed to provide additional medical information but also asked that the VA and its expert consider information already provided to the agency.  [Valois].

172.   According to Valois, Perkins, in one of their telephone conversations, had specifically asked Valois to send Dr. Moravec her application for disability retirement.   [Valois].

173.   Valois considered Perkins' March 26th letter to constitute her written consent to the application's release to Dr. Moravec.  [Valois].

174.   According to Perkins, although she told Valois that her medical information should be reviewed by an expert, she never agreed to allow her supervisors or Dr. Moravec to take that information from the withdrawn application for disability retirement.  [Perkins].

175.   The pertinent part of Perkins' March 26 letter states:

> *It is my understanding, per our telephone conversation that your opinion regarding proof of a disability is not based on any medical review of the information provided thus far. . .  I do believe that regardless of additional submissions, the agency and its medical expert should also consider information already provided to it.  Per our telephone conversation it is my understanding that no one consulted with an expert in reviewing*

*any of my doctor's previous submissions.*  [Exh. AN].

176. Valois thereafter forwarded to Dr. Moravec Perkins' disability retirement application, explaining that neither she (Valois) nor Perkins' supervisors had been provided with the application.  [Exh. AQ].

177. Valois did not believe there was any reason for her to see Perkins' disability retirement application.  [Valois].

178. By letter dated April 2, 2001, Dr. Schwarz informed Dr. Moravec of Perkins' diagnosis, her history of medication, and recommended essentially the same accommodations that attorney Abramowitz had previously recommended.  Dr. Schwarz recommended that Perkins work a 20-hour per week schedule for 8 to 12 weeks, then increase to full-time status.  Dr. Schwarz indicated that while Perkins preferred not to work on cases on which Virgil Lewis had worked or not to work on *Touhy*, unemployment, EEO, or MSPB cases, and not to be supervised by Morris, she was capable of doing all of those things.  [Exh. AS].

179. Valois asked Perkins to make herself available for an in-person examination by Dr. Moravec, though she understood that she could not legally compel Perkins to submit to such an evaluation.  [Exh AU; Valois].

180. Dr. Moravec never performed a personal examination of  Perkins.  [Moravec].

181. Although Dr. Moravec never performed a personal examination of Perkins, he prepared a medical report on Perkins in reliance on the DSM-IV; Perkins' job position

description; materials from Dr. Schwarz and Perkins' former psychiatrist, Gerald Fredman; correspondence between Valois and Perkins' attorneys; and Lewis' memorandum to Ferris dated April 4, 2001.  [Moravec].

182. Lewis' memorandum of April 4, 2001, labeled Perkins as irrational, mentally unstable, and a danger to herself and others in the workplace, including himself.

183. According to Dr. Moravec, the DSM-IV contains general descriptions of conditions such as major depressive disorder and dysthymia and that not all people diagnosed with these conditions will necessarily display the symptoms set forth in the manual. [Moravec].

184. Dr. Moravec did not conduct a review of Perkins' past performance evaluations. [Moravec].

185. Dr. Moravec acknowledged that a review of past performance evaluations would have been helpful to an individualized determination of whether Perkins was able to perform the essential functions of her position. [Moravec].

186. In the course of his review, Dr. Moravec found no basis for challenging Dr. Schwarz's conclusion that Perkins was not bipolar. [Moravec].

187. Dr. Moravec's report was incomplete, yet it was a decisive factor in Valois' and Ferris' decision not to allow Perkins to return to work.  [Valois].

188. By letter dated April 12, 2001, Valois informed Perkins that Dr. Moravec had determined in his medical report that Perkins was not a qualified person with a

disability in that he had concluded that Perkins could not perform the essential functions of her job without incurring a high probability of substantial harm.  [Exh. AU].

189.    Dr. Moravec's findings were communicated to Valois in a report titled "Evaluation of Disability Report—Barbara Perkins."  [Doc. AW].

190.    Dr. Moravec's report did not define "substantial harm" or specify the type of harm to which he was referring.  [Doc. AW].

191.    Valois was alarmed by Dr. Moravec's report, which she received on or about April 13, 2001, because she assumed Dr. Moravec to state that Perkins could not perform her job without endangering herself or others.  [Valois].

192.    Valois failed to seek clarification as to what Dr. Moravec meant by "substantial harm."

193.    Later, in deposition testimony taken August 14, 2003, Dr. Moravec clarified what he meant by "substantial harm."   He testified that he did not believe Perkins was likely to harm others physically; rather, he felt that Perkins was likely to be a professional harm to those she served and represented.  [Deposition testimony of Jule Moravec, PhD].

194.    Dr. Schwarz testified that she disagreed with Dr. Moravec's "substantial harm" assessment, since "there was never any possibility of harm to others."  [Schwarz].

195.    On April 12, 2001, Valois instructed Perkins that she was to remain on paid administrative leave and that, while on leave, Perkins was not to come to the office. [Exh. AU].

196.   In light of the conflicting reports of Drs. Schwarz and Moravec, Valois believed it had become important to engage in the "interactive process." [Valois].

197.   In an effort to engage in the "interactive process," Valois, in letters to Perkins' newly retained attorney, requested Perkins' "pertinent medical records." [Exhs. AY, BA].

198.   Although she was in receipt of a letter indicating Perkins' diagnosis, the applicable DSM-IV code, and a description of the nature of Perkins' illness, Valois believed that that information was insufficient for determining whether Perkins could be accommodated. [Valois].

199.   Valois would have liked to have seen a definitive prognosis and a list of the major life activities affected by Perkins' condition and received an explanation as to how Perkins' requested accommodations would have alleviated her symptoms and allowed her to perform the essential functions of her position. [Valois].

200.   In Valois' opinion, Dr. Schwarz's April 2, 2001, letter constituted to some extent the additional medical information she was seeking. [Valois].

201.   Valois believed that the "interactive process" failed around the point in time that she received Dr. Moravec's report in April 2001. [Valois].

202.   In response to Valois, Perkins' attorney at the time asked for clarification as to what specific documents Dr. Moravec needed and suggested that, in order to determine Perkins' ability to perform the essential functions of her position, Dr. Moravec consider Perkins' demonstrated and documented past performance. [Exh. AZ].

203. Perkins' attorney expressed a willingness to respond to specific inquiries Dr. Moravec might have, but noted that no specific requests had yet been made.  [Exh. AZ].

204. Perkins withdrew her request for accommodation in July 2001, because she did not believe the Agency would let her come back to work until she did so.  [Perkins].

205. Valois approved Perkins to return to work a few days after Perkins withdrew her request for accommodation in July 2001.

206. In a letter to Perkins' attorney dated July 31, 2001, Valois confirmed that Perkins had withdrawn her request for accommodation and invited Perkins to return to work on a full-time schedule as of September 4, 2001.  [Exh BB].

207. From the timing of Valois' decision which cleared Perkins to return to work (and the apparent dissipation of the Agency's concern for workplace safety), it can reasonably be inferred that the Agency's  reason for having kept Perkins away from the workplace was not that she was a danger to co-workers, but that it was because she had requested accommodation.

208. Ferris was involved in the Agency's decision to allow Perkins to return to work after she withdrew her request for accommodation. [Ferris].

209. Valois gave the following reasons for approving Perkins' return to work:

    a.    once the request for accommodation had been withdrawn, "there was no longer any forum in which to question [Perkins'] mental disability;" and

    b.    Lewis and Dotson, the employees who had felt threatened by Perkins'

33

presence, no longer worked for the VA.  [Valois].

210.  Neither Ferris nor Valois gave a reasonable or plausible explanation as to why Perkins was deemed fit to return to work once Perkins withdrew her request for accommodation, or why the previously articulated "workplace danger/threat" was no longer a concern.

211.  Perkins returned to work with the VA in September 2001 and remained there until October 2001, when she accepted a position as an Administrative Law Judge in the Kentucky/Tennessee region.  [Perkins].

212.  At all relevant times, Ferris and Morris worked out of their offices in Phoenix, Arizona, and Valois worked out of her office in Washington, D.C.

213.  The actions and conduct displayed by Valois, Ferris, Morris, Lewis, Dotson, Gonzales, and "Ms. Molinar" exhibited ignorance of mental illness and an unwarranted fear of persons who suffer therefrom.

## II  LEGAL ANALYSIS AND CONCLUSIONS OF LAW

### Fed.R.Civ.P. 52(c)

During the second day of trial, Defendant, pursuant to Fed.R.Civ.P. 52(c), moved for judgment as a matter of law on all claims.  [Tr. Trans. Day 2 at 13:35:30].  Rule 52(c) states, in pertinent part, that

> If during a trial without a jury a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party with

34

> respect to a claim or defense that cannot under the controlling law
> be maintained or defeated without a favorable finding on that
> issue, or the court may decline to render any judgment until the
> close of all the evidence.

Fed.R.Civ.P. 52(c).  For the reasons set forth below, I will grant in part and deny in part

Defendant's motion.

## 1. The Rehabilitation Act, 29 U.S.C. § 701 *et seq.*

### a. Failure to Accommodate and Disparate Treatment

In the employment-discrimination context, discriminatory treatment may take three

distinct forms.  These forms include (1) not making reasonable accommodations to the known

physical or mental limitations of an otherwise qualified individual ("failure to accommodate"),

(2) treating a qualified individual with a disability differently because of the disability

("disparate treatment"), and (3) using qualification standards or other selection criteria that

screen out or tend to screen out an individual with a disability ("disparate impact").  See

Davidson v. America Online, Inc., 337 F.3d 1179, 1188 (10th Cir. 2003) (interpreting

Americans with Disabilities Act ("ADA")).  Perkins' case involves the first two forms of

discrimination, failure to accommodate and disparate treatment.

To establish a prima facie case of failure-to-accommodate employment discrimination

under the Rehabilitation Act, 29 U.S.C. § 701 *et seq*., the plaintiff must demonstrate that (1)

he or she is disabled under the Act, (2) he or she would be "otherwise qualified" to participate

in the program, (3) the program receives federal financial assistance (or is a federal agency),

and (4) the program has discriminated against the plaintiff. McGeshick v. Principi, 357 F.3d 1146, 1150 (10th Cir. 2004). The standards used to determine violations of the Rehabilitation Act are the same standards applied under the ADA, except that the term "disabled" is given a broader definition under the ADA. Id. Additionally, federal employers' duties to accommodate disabled workers under the Rehabilitation Act are greater than the duties owed by federal grantees under the Rehabilitation Act. Woodman v. Runyon, 132 F.3d 1330, 1343 (10th Cir. 1997).

The burden-shifting framework created by McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) applies to claims brought pursuant to the Rehabilitation Act. Cummings v. Norton, 393 F.3d 1186, 1189 (10th Cir. 2005). Under McDonnell Douglas, after the plaintiff makes a prima facie case of discrimination, the burden shifts to the defendant-employer to articulate a nondiscriminatory reason for its conduct. Once the defendant meets its burden, "the plaintiff then assumes the normal burden of any plaintiff to prove his or her case at trial." E.E.O.C. v. Flasher Co., Inc., 986 F.2d 1312, 1316 (10th Cir. 1992).

However, "'[i]f the employer admits that the disability played a prominent part in the decision, or the plaintiff has other direct evidence of discrimination based on disability, the burden-shifting framework may be unnecessary and inappropriate.'" Davidson, 337 F.3d at 1189 (*quoting* Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 n.3 (10th Cir.1997)). In such a case, the employer will defend its decision on the ground that the plaintiff is not otherwise qualified for the position, with or without reasonable accommodation. Burden-shifting is thus

36

unnecessary because the issue of the employer's intent has been admitted and the plaintiff has direct evidence of discrimination on the basis of his disability.   If the plaintiff is in fact statutorily disabled, the determinative issue in a failure-to-accommodate case will not be the employer's intent, but whether the employee is "otherwise qualified," with or without reasonable accommodation, to perform the job, a factual dispute that is resolved through traditional methods of proof.  Id.

In this case, it is not disputed that, at the times in question, Perkins suffered from a mental disability (major depression) that substantially limited a major life activity (working). See 42 U.S.C.§ 12102(2); McGeshick v. Principi, 357 F.3d 1146, 1150 (10th Cir. 2004); Doc. 73 at 11, ¶ 78.  I thus conclude that at the times relevant to this action, Perkins was disabled for purposes of the Rehabilitation Act.  Nor do the parties dispute that Defendant is a federal employer and, as such, covered by the Rehabilitation Act.  [Doc. 73 at 11, ¶ 77].

Additionally, I find that ample evidence exists to support the conclusion that Perkins' disability caused Defendant to take action against her.  For example, Valois testified that Perkins was placed on administrative leave as a direct result of the information contained in Dr. Moravec's medical report.  That report was based in large part on the specific examples of "past [concern-causing] behavior on the part of [Perkins]" solicited by Gregory Ferris from Virgil Lewis and Agnes Dotson.  There was no evidence that Perkins was placed on leave because of inadequate work performance.  Indeed, the credible evidence revealed that Perkins was an excellent attorney.  To the extent that the quality of Perkins' work began to slip from

July until November 2000, any slippage was not enough to cause Ferris to rate her lower than successful on that year's performance appraisal.  Accordingly, "the determinative issue" with respect to her failure-to-accommodate claim becomes whether Perkins was "otherwise qualified," with or without reasonable accommodation, to perform her job.

Under the Rehabilitation Act, a qualified individual with a disability is one who, with or without reasonable accommodation, can perform the essential functions of the position in question without endangering the health and safety of the individual or others and who meets the experience or education requirements of the position in question.  Woodman, 132 F.3d at 1339 (quoting 29 C.F.R. § 1614.203(a)(6)).  Having heard and considered the trial testimony and having reviewed and studied the exhibits in this case, I conclude that Perkins has proven that she was indeed qualified to perform the essential functions of her position with Defendant and that her requested accommodation was reasonable.[2]

It is not disputed that, except for a period of approximately four months between July and November 2000 when she became less productive than usual, Perkins demonstrated

---

[2]  I have considered Defendant's argument, as set forth in its trial brief, that Chincillo v. Powell, 236 F.Supp. 2d 18 (D.D.C. 2003) precludes Perkins from asserting that she was qualified to perform the essential functions of her position between December 12, 2000, when she first contacted an EEO officer, and February 26, 2001, when she withdrew her application for disability retirement and, thus, was entitled to a reasonable accommodation.  [Doc. 77 at 5]. However, the exhibits and trial testimony revealed that Perkins did not request accommodation until March 2001 and that her disability retirement application had been withdrawn before she notified defendant of her intent to return to work.  [Exh. AG; Perkins].  Because I am persuaded that Perkins did not request a reasonable accommodation at any time her retirement application was pending, I believe that Chincillo is inapplicable.

excellent legal ability and earned the praise of her co-workers and supervisors. [Ferris, Sanzari, Poteat, Morris]. According to Gregory Ferris, any slippage in Perkins' work during this time did not prevent him from rating her work as satisfactory at her annual performance evaluation. [Ferris]. Though Perkins was perceived sometimes to display irritability, a temper, and a sharp tongue, she was never disciplined for exhibiting those traits and, most significantly, neither of her chief complainants, Virgil Lewis and Agnes Dotson, filed any sort of internal charge or grievance against her. [Schwarz, Lewis, Dotson].

Dr. Moravec testified that Perkins was not qualified to perform the essential functions of the staff attorney position. [Moravec]. Dr. Moravec, however, never evaluated Perkins in person, nor did he ever review her job performance evaluations. Instead, he relied on the DSM-IV; Perkins' position description; materials from Drs. Schwarz and Fredman; correspondence between Valois and Perkins' attorneys; and Lewis's memorandum to Ferris. [Id.]. Moreover, Dr. Moravec acknowledged that the DSM provides a general description of conditions listed therein and that symptoms laid out in the DSM may or may not manifest in a particular individual. [Moravec]. By contrast, Dr. Schwarz, who had been Perkins' treating physician since 1995, medically cleared Perkins to return to work on a 20-hour per week schedule beginning March 26, 2001. Dr. Schwarz anticipated that Perkins would "soon" be able to perform the full duties of her position. [Exh. AE]. In the course of his review, Dr. Moravec found no basis for challenging Dr. Schwarz's conclusion that Perkins was not bipolar. [Moravec]. I thus find that Perkins was qualified to perform the essential functions of a staff

attorney with Defendant. The question then becomes whether Defendant could have reasonably accommodated Perkins' disability.

Perkins testified that on the days she felt unable to come to work, she would use her sick leave.[3] [Perkins].  According to Morris, Perkins was requesting leave on an almost daily basis between August and December 2000.  [Morris].  However, these requests were regularly approved.  [Schwarz].  Morris also testified that she approved Perkins' request in the autumn of 2000 for one day off each week for a period of roughly eight weeks.  [Morris]. Moreover, Perkins' initial request for a reduced work schedule of 20 hours per week was approved by Morris on December 12, 2000.  [Morris; Exh. V].  According to Morris, "[a]ll of Barbara's leave was always granted. I granted everything she ever asked for."  [Morris].

Although Perkins' original attorney's letter to Valois made a variety of requests, I find that the only accommodation  Perkins truly asked for was a 20-hour work week for 8 to 12 weeks.  [Exh. AS].  Though Dr. Schwarz believed Perkins' stress would be reduced if she were to avoid working on cases previously worked on by Lewis, as well as cases touching on particularly complex areas of law, Dr. Schwarz nevertheless deemed Perkins "capable of performing her full duties if this [was] necessary."  [Id. at 2].  Given that Defendant had generously allowed Perkins leave in the past and had actually earlier approved a 20-hour work week, I conclude that Defendant could reasonably have accommodated Perkins' disability by

---

[3] Perkins testified, however, that on the days she had a scheduled appointment or was required to attend a hearing or conference, she managed to do whatever was necessary to ensure her attendance.  [Perkins].

allowing her a reduced work schedule for 8 to 12 weeks.

Defendant argues that it was not obligated to accommodate Perkins because (1) her requested accommodations were unreasonable, (2) Defendant would have been unduly burdened by the requested accommodations, (3) Perkins was a danger to both herself and her co-workers, and (4) Perkins failed to engage in the interactive process. [Doc. 73 at 11-12; ¶¶ 81-86]. As explained above, however, I find that Perkins' requested accommodation— a temporary 20-hour work week—was neither unreasonable nor unduly burdensome.[4]

I am also unpersuaded by Defendant's "direct threat" defense. The term "direct threat" is defined as "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." Den-Hartog v. Wasatch Acad., 129 F.3d 1076, 1088 (10th Cir. 1997) (ADA case determining whether plaintiff/employee and his son posed direct threat to others in school community). In light of the information it had from Drs. Schwarz, Moravec, and David Graeber, a psychiatrist and colleague of Perkins, I further find that it was not reasonable for Defendant to have considered Perkins a danger to her co-workers. As early as December 11, 2000, Dr. Schwarz had assured Morris that, not only was Perkins not a danger to herself or others, Perkins actually had no history of out-of-control behavior. [Morris].

Even Defendant's chosen expert, Dr. Moravec, explained that, while Perkins could possibly cause *professional* harm to clients by underserving them, Perkins posed no physical

---

[4] Though Ferris expressed concern over a reduced work schedule to Morris, he never communicated this concern to Perkins. [Perkins; Exh. AF].

danger to others.  [Moravec].  In a letter to Dr. Moravec, Perkins' former colleague Dr. David Graeber stated that he had never witnessed any inappropriate or threatening behavior by Perkins.  [Exh. 12].  In evaluating whether an individual poses a direct threat, factors to be considered include (1) the duration of the risk, (2) the nature and severity of the potential harm, (3) the likelihood that the potential harm will occur, and (4) the imminence of the potential harm.  Den Hartog, 129 F.3d at 1088-89.  In the present case, Valois  testified that despite the expressed concerns of Lewis and Dotson, she failed to conduct any investigation into their allegations of fear for their physical safety.  [Valois].

The Tenth Circuit has expressly held that

> [t]he determination that an individual is unqualified because she poses a direct threat must be "based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job," which in turn must be based on "a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence."

Doebele v. Sprint/United Management Co., 342 F.3d 1117, 1134 (10th Cir. 2003) (*quoting* McKenzie v. Dovala, 242 F.3d 967, 974 (10th Cir. 2001).  The record in this case is bereft of any credible evidence that Valois' belief that Perkins posed a physical threat to her co-workers was based on a reasonable medical judgment. See id.  To the contrary, Valois' disregard of Dr. Schawarz's opinions and reliance on those of Dr. Moravec "support[s] the inference that [the placement of Perkins on involuntary leave was] improperly based on myth, fear, and stereotype, rather than an individualized evaluation of [Perkins'] abilities."  See id.

42

The "direct threat" defense is an affirmative defense.  Den Hartog, 129 F.3d at 1088; see also Whitney v. Board of Educ. of Grand County, 292 F.3d 1280, 1286 n.3 (10th Cir. 2002).  In this case, I find that Defendant has not borne its burden of establishing that Perkins was a direct threat to others in the workplace, and all of the credible evidence points to the fact that at no time did she pose a threat of harm to herself or others.

Defendant's final articulated reason for not accommodating Perkins is that Perkins failed to engage in the interactive process by refusing to (1) answer questions from Dr. Moravec or (2) provide adequate documentation of her disability.  [Valois; Doc. 73 at 9, ¶ 61]. At trial, however, Valois conceded that at the time she was requesting additional medical information from Perkins, the parties were not yet at a point in the administrative litigation where she could have issued discovery requests or compelled Perkins to submit to an in-person evaluation by Dr. Moravec.  [Valois].  As for the issue of inadequate documentation, documentation of a disability is considered sufficient if it: (1) describes the nature, severity, and duration of the employee's impairment, the activity or activities that the impairment limits, and the extent to which the impairment limits the employee's ability to perform the activity or activities; and, (2) substantiates why the requested reasonable accommodation is needed. Equal Employment Opportunity Comm'n, Enforcement Guidance: Disability-Related Inquiries and Medical Examinations of Employees Under the Americans with Disabilities Act (ADA), § B(10) (EEOC Notice 915.002) (July 27, 2000).  Moreover, if submitted medical information is found to be insufficient, the employer should explain why the documentation is insufficient

and allow the employee an opportunity to provide the missing information.  See Enforcement Guidance: Disability-Related Inquiries and Medical Examinations of Employees Under the Americans with Disabilities Act (ADA), § B(11).  When an employee provides sufficient evidence of the existence of a disability and the need for reasonable accommodation, continued efforts by the employer to require that the individual provide more documentation and/or submit to a medical examination could constitute evidence of discriminatory intent.  See id.

In her April 2, 2001, letter to Dr. Moravec, Dr. Schwarz, at Valois' request, described the nature, severity, and duration of Perkins' impairment as a diagnosis of recurrent major depression and dysthymic disorder that required therapy since 1992 and various anti-depressants.  [Exh. AS].  Dr. Schwarz also described the extent to which Perkins' condition limited her ability to work, explaining that Perkins at times became very inattentive, stressed, and anxious, and fell behind.  [Id.].  Finally, Dr. Schwarz explained why she believed the recommended accommodations were needed and were in Perkins' interests.  [Id.]  I find that the information provided by Dr. Schwarz constitutes sufficient evidence of Perkins' disability and need for reasonable accommodation.

Given that Dr. Schwarz's information sufficiently described the nature, severity and duration of Perkins' impairment, described the extent to which Perkins' condition limited her ability to work, and explained the need for the recommended accommodations, I conclude that Defendant's continued requests for additional medical information and that she submit to an evaluation by Dr. Moravec, particularly when considered in connection with other information

44

elicited at trial, evidences discriminatory intent.   For example, Valois testified that Dr. Moravec's report was a factor in Defendant's decision not to let Perkins return to work on March 26, 2001.  [Valois].  Dr. Moravec's report was presumably as influential then as it was when Perkins later withdrew her request for accommodation. Yet once Perkins withdrew her request, she was immediately asked to return to work.  Valois testified that this was the case because (1) there was no longer a forum in which to question Perkins' disability and (2) Lewis and Dotson, the two VA employees who expressed a physical fear of Perkins, no longer worked for the agency.  [Valois].  Given Defendant's earlier reliance on Dr. Moravec's report, Defendant's subsequent decision to allow Perkins to return to work as soon as she withdrew her request for reasonable accommodation constitutes evidence of discriminatory intent. This finding is bolstered by the fact that the two reasons Valois gave for her decision are inconsistent with her testimony that, in light of the conflicting medical evidence, Valois was concerned about Perkins' ability to perform the essential functions of her job safely.  I also find that Valois' decision to invite Perkins to return to work immediately after Perkins withdrew her request for accommodation is inconsistent with Valois's testimony that not long before she extended her invitation she believed Perkins to be fragile and unstable. Accordingly, I find that Defendant violated the Rehabilitation Act by refusing Perkins' request for reasonable accommodation.

I also find that Defendant intentionally discriminated against Perkins by treating her differently from the way it treated non-disabled co-workers.  Compare Davidson, 337 F.3d at

1188 (in ADA action, explaining that claimant makes a prima facie case of discrimination by demonstrating that he or she (1) is disabled; (2) is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) was discriminated against because of disability and further explaining that putting forth proof of disparate treatment is one method by which claimant may satisfy element (3)) with Baucom v. Potter, 225 F.Supp.2d 585, 591 (D.Md. 2002) (describing elements of disparate-treatment claim under Rehabilitation Act as proof that claimant (1) has a disability, (2) is otherwise qualified for the position, and (3) has suffered an adverse employment action solely because of his disability).  The most glaring examples of the disparate treatment to which Perkins was subjected are Defendant's soliciting of specific examples of her behavior from Lewis and Dotson and her placement on administrative leave.  Valois testified that Defendant placed Perkins on administrative leave as a result of the information contained in Dr. Moravec's medical report, specifically, Dr. Moravec's opinion that Perkins could not perform the essential functions of her job without posing a danger to herself and without incurring a high probability of substantial harm.  Dr. Moravec's report was in turn based in large part on the e-mail message and the memorandum that Dotson and Lewis sent Ferris detailing what they believed to be Perkins' hostile behavior.

The hostility displayed by Dotson and Lewis toward Perkins is unmistakable and transparent.  In his memorandum, Lewis described Perkins at different times as being agitated, argumentative, threatening, hostile and confrontational, physically aggressive, and irrational.

46

[Exh. AT].  In her e-mail, Dotson described Perkins as anxious, angry, and moody.  Dotson also recounted several incidents that she had learned of second-hand and that could only be described as portraying Perkins as irrational and out of control.  [See Exh. 10].  At least two of Dotson's examples related to conduct that allegedly occurred before Perkins began work with Defendant.  [Id.].

Both Perkins and Lewis testified that their relationship was not collegial.  In Dotson's words, "To this day I do not know why [Perkins] hated [Lewis] much."  [Exh. 10].  Yet only the disabled employee was placed on administrative leave because it was for the disabled employee only that management sought specific examples of concern-causing behavior.  In addition to comprising one of the links in the chain of actions taken by Defendant that culminated in Perkins' placement on administrative leave and, thus, the treating of Perkins differently from her non-disabled co-workers, the e-mail from Dotson and the memorandum from Lewis evidence such a severe and substantial level of hostility as to amount to an adverse employment action. See Medina v. Income Support Div., New Mexico, 2005 WL 1519061, *5 (10th Cir. 2005) (while vague assertions of co-worker hostility are insufficient to demonstrate an adverse employment action, specific and detailed examples of sufficiently severe hostility may allow trier of fact to find that claimant was subjected to an adverse employment action).  In light of these findings, I conclude that Perkins has demonstrated that Defendant intentionally discriminated against her on the basis of her disability and, therefore, has established a meritorious claim of disparate treatment in violation of the Rehabilitation

47

Act.

### b. Retaliation

To establish a prima facie case of retaliation, a plaintiff must show (1) protected employee action; (2) adverse action by an employer either after or contemporaneous with the employee's protected action; and (3) a causal connection between the employee's action and the employer's adverse action.  Doebele, 342 F.3d at 1135.  The date of an adverse action is critical "because the closer it occurred to the protected activity, the more likely it will support a showing of causation."  Anderson v. Coors Brewing Co., 181 F.3d 1171, 1179 (10th Cir. 1999).  Additionally, the plaintiff must prove that the defendant's action was intentionally retaliatory.  Gunnell v. Utah Valley State College, 152 F.3d 1253, 1263 (10th Cir. 1998).  Once the plaintiff has made his or her prima facie case, the burden shifts to the defendant employer to show an articulate, non-retaliatory reason for its action.  If the defendant meets its burden, the burden shifts back to the plaintiff to show by clear and convincing evidence that he or she was terminated in retaliation for exercising rights protected by the applicable statute.  Sanjuan v. IBP, Inc., 160 F.3d 1291, 1298 (10th Cir. 1998).

While the Tenth Circuit liberally defines the phrase "adverse employment action," it has not set forth a concrete rule as to what constitutes such an action.  Anderson, 181 F.3d at 1178 (internal quotation omitted).  "An adverse employment action includes acts that 'constitute [ ] a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a

significant change in benefits.'" <u>Dick v. Phone Directories Co., Inc.</u>, 397 F.3d 1256, 1268 (10th Cir. 2005) (*quoting* <u>Sanchez v. Denver Pub. Schs.</u>, 164 F.3d 527, 532 (10th Cir.1998)). Yet an adverse employment action is not limited to such acts. Instead, 'adverse employment action' is liberally interpreted on a case-by-case basis with an eye toward examining the unique factors relevant to the situation at hand. <u>Id.</u> A mere inconvenience or an alteration of job responsibilities will not be considered to be an adverse employment action. <u>Sanchez</u>, 164 F.3d at 532. On the other hand, sufficiently severe co-worker hostility, particularly when described in detail and with specificity, may allow the trier of fact to conclude that the claimant was subjected to an adverse employment action. <u>See</u> <u>Medina</u>, 2005 WL 1519061 at *5; <u>see also</u> <u>Dick</u>, 397 F.3d at 1269.

In this case, Perkins filed an EEO charge of discrimination on February 12, 2001. [Exh. BP]. The EEO charge was twice amended, the first time on April 7, 2001 and next on July 6, 2001. Yet the credible evidence elicited at trial revealed that it was not the EEO charge of discrimination as much as Perkins's request for reasonable accommodations under the Rehabilitation Act that triggered what I find by a preponderance of the evidence to have been Defendant's retaliatory actions.

On March 14, 2001, Perkins, through her attorney at that time, made a request for reasonable accommodations. One week later, on March 21, 2001, Ferris asked Lewis and Dotson to "relate any past behavior on the part of Barbara which cause[d them] concern in the workplace and [to] summarize the things that occurred over the years to cause that concern."

[Ferris, Exh. 9].  Rephrasing Ferris' request as one for "specifics on actions of Ms. Perkins, which may be considered hostile," Lewis provided examples of what he viewed as Perkins' "hostile," "physically aggressive," "confrontational," "threatening," and "dangerous" behavior. [Exh. AT].  Lewis related incidents dating back as far as the start of his tenure with Defendant. Somewhat curiously, Lewis included as one example of Perkins' "hostile" actions the fact that she "would exercise frequently while at the office and would change into bright red high top shoes and white socks."  [Id.].  He also complained that she "had a large straw hat that looked Vietnamese in style."  [Id.].

What is even more troubling than the mere fact of his recitation, however, and what bolsters the conclusion that a pronounced hostility ran from Lewis toward Perkins is that, in his memorandum to Ferris, Lewis recounted at least one interaction with Perkins that, if placed in context, would certainly have not only appeared not hostile but entirely reasonable.  In his memorandum, Lewis explained that on one occasion when he stopped at *Building 18* to pick up mail, Perkins "ran down the hall and up to me shouting that I needed to announce myself when I came to the office."  [Exh. AT].  Yet the credible trial testimony in this matter established that (1) *Building 18*, which was near the VA's psychiatric ward, had been broken into; (2) angry veterans in the psychiatric ward were verbally abusive to VA employees; (3) a veteran once shot himself on a bench across from *Building 18*; (4) assaults and homicides had occurred on the VA grounds; and (5) employees other than Perkins who had worked in *Building 18* had expressed security concerns.  [Dotson, Ferris].  Lewis included none of this

50

information in his memorandum to Ferris.  Moreover, Lewis concluded his memorandum with

the following declaration:

> I am concerned that what I had originally perceived as jealousy
> and/or protection of turf is in fact a serious mental instability.  I
> believe that the irrational responses and actions of Ms. Perkins
> could translate into physical harm for the staff of our office.  That
> includes me.  The fact that she has required hospitalization
> (commitment?) for her condition further strengthens my belief
> that depending on her level of decompensation, she could be a
> danger to any one she perceives as a threat.

[Exh. AT].

In her summary, Dotson portrayed Perkins as angry, dangerous, moody, and irrational.

Prefacing her two and one-third page, single-spaced e-mail with "[t]here is more I could have

written[,]" Dotson recounted events occurring over a ten-year period.  [Exh. 10].  Dotson's e-

mail described raised voices, slamming doors, slamming chairs, and rattling windows.  Based

on her second-hand knowledge of the alleged event, Dotson relayed an episode during which

Perkins chased after her husband with a broom.   The totality of Dotson's e-mail left no doubt

(from Dotson's perspective) that Perkins' presence in the workplace caused those working

alongside her to fear for their physical safety.  [Id.].

Although Ferris suggested that Lewis and Dotson contact him if they "believe[d] that

[co-workers] Jim [Liesz] or Elaine [Gonzales] would have anything to offer in this regard

based on their experiences," Ferris personally solicited no information from anyone other than

Virgil Lewis and Agnes Dotson.  [See Exh. 9].  The summaries provided by Lewis and Dotson

formed a basis for the medical report prepared by Dr. Moravec on Perkins.  [Moravec].  Dr. Moravec's report in turn caused Valois to become alarmed and form the belief that Perkins was a danger who was unable to do her job without incurring a substantial risk of harm. Accordingly, on March 26, 2001, Valois placed Perkins on administrative leave and forbade her from coming in to the office.

Under the circumstances, I conclude that the entirety of the actions of Defendant, which began with a request that two employees provide specific examples of a co-worker's concern-causing behavior "over the years" and escalated into the use of that information as foundation for a medical report that, in turn, served as the basis for the banishment from the workplace of one of Defendant's better attorneys, amounted to an adverse employment action.[5]  That Defendant's action was taken one week after Perkins submitted her request for accommodations—the temporal proximity— persuades me that it was taken in retaliation for

_____

[5]  In so concluding, I express no opinion as to whether the placement of Perkins on paid administrative leave amounted to an adverse employment action.  Compare  Peltier v. United States, 388 F.3d 984, 988 (6th Cir. 2004) (employee did not suffer adverse employment action where she was on paid administrative leave during internal investigation and thereafter was completely exonerated and allowed to return to work) and  Breaux v. City of Garland, 205 F.3d 150, 158 (5th Cir.2000) (police officer suffered no adverse employment action where he was temporarily placed on paid administrative leave during internal investigation) with Foster-Bey v. Potter, 296 F.Supp.2d 195, 205 (D.Conn. 2003) (being prohibited from coming to work for nearly a month, despite his continuing to receive full pay, changed terms and conditions of plaintiff's employment sufficiently to constitute an adverse employment action where plaintiff returned to work without public exoneration and to the reduced staffing and the removal of authority to perform certain tasks). Instead, I find that Perkins has provided specific examples of co-worker hostility sufficiently severe to rise to the level of an adverse employment action and that this co-worker hostility was one chain in the link of events and actions by Defendant that ultimately led to Perkins' banishment from the workplace.

Perkins' request.  See Doebele, 342 F.3d at (in action brought pursuant to the ADA, noting that ADA expressly prohibits retaliation against individuals who exercise rights granted by its provisions).  I further find that Defendant acted with an intentional discriminatory motive inasmuch as one week after Perkins engaged in the protected activity of requesting reasonable accommodations, Defendant, through Ferris, asked Perkins' co-workers, Virgil Lewis and Agnes Dotson, to provide specific examples of behavior that caused them to feel "concern in the workplace."   [Exh. 9].   Defendant's intentional discriminatory motive is further demonstrated by the fact that the information supplied by Lewis and Dotson, which was initially used as a basis for placing Perkins on administrative leave, apparently became irrelevant (and not a concern of the Agency) once Perkins withdrew her request for accommodation.  For all of the foregoing reasons, I find in favor of Perkins on her claim for retaliation.

### 2. The Privacy Act, 5 U.S.C. § 552a

### a. Wrongful Access and Disclosure

The Privacy Act, 5 U.S.C. § 552a, ("the Act") was enacted "'to protect the privacy of individuals identified in information systems maintained by Federal agencies' by preventing the 'misuse' of that information." Thomas v. United States Dep't of Energy, 719 F.2d 342, 345-46 (10th Cir.1983) (internal quotations omitted).  It states, in pertinent part, that "[n]o agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by,

or with the prior written consent of, the individual to whom the record pertains . . . ." 5 U.S.C. § 552a(b).  The Act also provides that agencies maintaining a system of records "shall . . . upon request by any individual to gain access to his record or to any information pertaining to him which is contained in the system, permit him . . . to review the record and have a copy made of all or any portion thereof . . . ."  5 U.S.C. § 552a(d)(1).  As a remedy for the refusal to allow access, the Act permits a court to enjoin the agency from withholding the records and order the production to the complainant of any agency records improperly withheld from him. 5 U.S.C. § 552a(g)(3)(A).  The court may also assess against the United States reasonable attorneys' fees and other litigation costs reasonably incurred in any refusal-of-access case in which the complainant has substantially prevailed.  See 5 U.S.C. § 552a(g)(3)(B).  With respect to an unauthorized disclosure of records, actual damages may be awarded if "the court determines that the agency acted in a manner which was intentional or willful . . . ."  See 5 U.S.C. § 552a(g)(4).

While courts have struggled over the meaning of "intentional or willful," the Tenth Circuit has held that intentional or willful conduct falls somewhere between grossly negligent actions and those done with premeditated malice.  Andrews v. Veterans Admin. of U.S., 838 F.2d 418, 424-425 (10th Cir. 1988).  The Tenth Circuit accordingly defines intentional or willful conduct as conduct that is "so patently egregious and unlawful that anyone undertaking the conduct should have known it unlawful, . . . or conduct committed without grounds for believing it to be lawful or action flagrantly disregarding others' rights under the Act."  Id. at

425.  At the very least, intentional or willful conduct must amount to reckless behavior.  Id.

The first of Perkins' Privacy Act claims involves Valois's accessing and then disclosing to Dr. Moravec Perkins' withdrawn disability retirement application.  [Perkins; Valois; Doc. 79 at 1].  Both Perkins and Valois testified that they had a telephone conversation[6] during which they discussed the need for Defendant's expert to review Perkins' medical information.  [Perkins; Valois].  Perkins, however, testified that she never agreed or even understood that Defendant planned to cull that information from her withdrawn application for disability retirement.  [Perkins].  For her part, Valois testified that Perkins was specific and adamant in her request to have the disputed application forwarded to Dr. Moravec.  [Valois].  Valois also explained that, until her conversation with Perkins, she did not even know the application existed and would not have known from whom to request it had Perkins not so instructed her.  [Valois].  Valois further testified that following their telephone conversation, Perkins provided written confirmation of her request.  [Valois; Exh. AN].

I find that, in light of the particular circumstances, Valois's decision to forward Perkins' disability retirement application to Dr. Moravec does not amount to intentional or willful behavior.  The parties do not dispute that Perkins asked, both orally and in writing, for Defendant's expert (in this case, Dr. Moravec) to consider information already provided to Defendant in making an assessment of her disability.  [Perkins; Valois; Exh. AN].  Given the

---

[6] While Valois testified to two telephone conversations, Perkins appeared to recall only one.  [Valois; Perkins].

telephone conversation and Perkins' subsequent written request that "regardless of additional submissions, the agency and its medical expert . . . also consider information already provided to it[,]" it was not entirely unreasonable (though not particularly prudent, as will be explained below) for Valois to believe that Perkins had authorized the release of her disability retirement application to Dr. Moravec. [Exh. AN]. That Valois understood her narrow mandate is further evidenced by her letter to Dr. Moravec, in which she states:

> Enclosed is a copy of all of the medical information we have. The most extensive medical information we have, at this time, is that provided with [Perkins'] application for disability retirement. **Ms. Perkins did not provide this information to me or to her supervisors, but she specifically requested that In provide to you all of the medical information in the possession of the agency.**

[Exh. AQ, emphasis added]. I interpret the emphasized statement as some attempt by Valois to safeguard the confidentiality of the retirement application by ensuring that it be viewed by nobody but a medical professional. Valois's effort in this regard persuades me that her conduct was neither intentional nor willful. <u>See</u> <u>Andrews</u>, 838 F.2d 418 at 425 (agent's attempt to sanitize employee medical records before providing them to VA, though ultimately unsuccessful, demonstrated agent's attempt to comply with Privacy Act and negated finding of any conduct greater than negligence).

In finding that Valois's actions were not unreasonable however, I do not necessarily find that Valois acted wisely. Valois testified that during her telephone conversations with Perkins, Perkins would begin to cry and sob so uncontrollably that Valois formed the opinion

that Perkins was emotionally stable and fragile.  [Valois].  At this point in time, Perkins also

was unrepresented by counsel and was serving as her own attorney.  [Valois; Perkins].  In light

of Perkins' emotional state and the fact that she was essentially proceeding *pro se* when she

spoke with Valois, I conclude that Valois could have chosen a more judicious course.  For the

reasons previously stated, however, I do not believe that Valois's actions amounted to

intentional or willful conduct.  Accordingly, Defendant's motion for judgment as a matter of

law with respect to Perkins' claim of wrongful access and disclosure under the Privacy Act is

granted.

### b. Denial of Access

Perkins second Privacy Act claim is that, despite three requests between December

2000 and March 26, 2001, Defendant unreasonably delayed the production of her OPF.

[Perkins; Exh. 7].  In April 2001, Perkins finally received the requested file.  [Perkins].

Because she ultimately was provided with her OPF, Defendant maintains that any denial-of-

access claim is moot.  [Doc. 77 at 23-24].

As stated above, in an action alleging an unlawful withholding of records requested

under § 552a(d)(1), the remedy afforded by the Act is an injunction against the withholding

and an order requiring disclosure of the records.  Wren v. Harris, 675 F.2d 1144, 1147 (10th

Cir. 1982) (*quoting* 5 U.S.C. § 552a(g)(3)(A)).  Courts have held that a denial-of-access claim

becomes moot once the requested records are disclosed.  See Falwell v. Executive Office of

the President, 158 F.Supp.2d 734, 740 (W.D.Va. 2001).  Additionally, monetary damages are

not authorized in such an action. <u>Wren</u>, 675 F.2d at 1147.  On the other hand, attorneys' fees and costs incurred in connection with the litigation of an action brought pursuant to § 552a(d)(1) may be assessed where the plaintiff has "substantially prevailed." 5 U.S.C. § 552a(g)(3)(B); <u>Gowan v. U.S. Dep't of Air Force</u>, 148 F.3d 1182, 1194 (10th Cir. 1998). Unlike a failure-to-disclose claim, the Court need not determine that a defendant has acted intentionally or willfully.  <u>See</u> <u>id.</u> at 1194-95.

A Privacy Act plaintiff has substantially prevailed "if  the lawsuit was reasonably necessary and substantially caused the requested records to be released."  <u>Gowan</u>, 148 F.3d at 1195) (concluding that Freedom of Information Act (FOIA) attorneys' fees analysis applies in context of Privacy Act).  In this case, Perkins has not demonstrated that her lawsuit caused her OPF to be released.  To the contrary, Perkins, who filed her *Complaint for Violation of Civil Rights* on November 4, 2002, [<u>see</u> Doc. 1], testified that she received her OPF sometime in April of 2001.  [Perkins].  For purposes of awarding fees and costs, therefore, Perkins, has not "substantially prevailed" on her denial-of-access claim.  Accordingly, Defendant's motion for judgment as a matter of law on this claim is granted.

## C. CONCLUSION

For the foregoing reasons, I find in favor of Plaintiff Barbara Perkins with respect to her claims for (1) failure to accommodate in violation of the Rehabilitation Act, 29 U.S.C. § 701 *et seq*.; (2) disparate treatment in violation of the Rehabilitation Act; and (3) retaliation in violation of the Rehabilitation Act.  I find for Defendant with respect to Perkins' claims for

wrongful access and disclosure in violation of the Privacy Act, 5 U.S.C. § 552a(b); and denial of access to records in violation of the Privacy Act, 5 U.S.C. § 552a(d) and therefore grant Defendant's motion for judgment as a matter of law, Fed.R.Civ.P. 52(c), as to those claims. In all other respects, Defendant's motion is denied.

**IT IS, THEREFORE, ORDERED** that the Court finds in favor of Plaintiff Barbara Perkins with respect to her claim for failure to accommodate in violation of the Rehabilitation Act, 29 U.S.C. § 701 *et seq*.

**IT IS FURTHER ORDERED** that the Court finds in favor of Plaintiff Barbara Perkins with respect to her claim for disparate treatment in violation of the Rehabilitation Act, 29 U.S.C. § 701 *et seq*.

**IT IS FURTHER ORDERED** that the Court finds in favor of Plaintiff Barbara Perkins with respect to her claim for retaliation in violation of the Rehabilitation Act, 29 U.S.C. § 701 *et seq*.

**IT IS FURTHER ORDERED** that the Court finds in favor of Defendant with respect to Perkins' claim for wrongful access and disclosure in violation of the Privacy Act, 5 U.S.C. § 552a(b).

**IT IS FURTHER ORDERED** that the Court finds in favor of Defendant with respect to Perkins' claim for denial of access to records in violation of the Privacy Act, 5 U.S.C. § 552a(d).

**IT IS FURTHER ORDERED** that Defendant's motion for judgment as a matter of

law, Fed.R.Civ.P. 52(c), is **DENIED** with respect to Perkins' claims for failure to accommodate, disparate treatment, and retaliation in violation of the Rehabilitation Act.

**IT IS FURTHER ORDERED** that the Defendant's motion for judgment as a matter of law, Fed.R.Civ.P. 52(c), is **GRANTED** with respect to Perkins' claims of wrongful access and disclosure and denial of access to records in violation of the Privacy Act, 5 U.S.C. § 552a(b), (d).

**IT IS FURTHER ORDERED** that the matter of damages be addressed separately, after a status conference to be convened with counsel upon entry of this Opinion.

**SO ORDERED** this 5th day of July 2005, in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
UNITED STATES DISTRICT JUDGE