

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

FILED
UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

05 AUG 12 PM 1:08

CLERK-ALBUQUERQUE

BARBARA L. PERKINS,

    Plaintiff,

v.                  No. CIV - 02-1392 MCA WDS

THE HONORABLE ANTHONY J. PRINCIPI,
SECRETARY OF VETERANS AFFAIRS,

    Defendant.

## PLAINTIFF'S POST-TRIAL BRIEF ON DAMAGES

### INTRODUCTION

On July 5, 2005, the Court issued its *Memorandum Opinion and Order* (doc. 88) in this matter. The Court found for Plaintiff Barbara L. Perkins ("Perkins") on the issue of liability regarding her claims for failure to accommodate, disparate treatment and retaliation made pursuant to the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*, and for Defendant on Perkins's claims made pursuant to the Privacy Act, 5 U.S.C. § 552a. Pursuant to the Court's Order at the telephonic hearing held on July 12, 2005, Perkins respectfully submits the following brief in support of her claims for damages.

### ARGUMENT

I.    **PERKINS IS ENTITLED TO DAMAGES FOR EMOTIONAL DISTRESS, PAIN, AND SUFFERING SHE ENDURED AND CONTINUES TO ENDURE, BECAUSE OF DEFENDANT'S INTENTIONAL VIOLATIONS OF THE REHABILITATION ACT.**

Section 102 of the Civil Rights Act of 1991 (Pub. L. 102-166), codified at 42



1

U.S.C. §1981a, significantly expanded the monetary relief potentially available to plaintiffs in discrimination claims against employers. The statute permits a plaintiff to recover compensatory damages in the case of intentional discrimination under Title VII of the Civil Right Act of 1964 ("Title VII"), 42 U.S.C. §§2000e *et seq.*, the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§12101 *et seq.*, or the federal employment sections of the Rehabilitation Act of 1973, 29 U.S.C. §791, through application of 42 U.S.C. §1981a(a)(2). *See*, Tafoya v. Bobroff, 865 F.Supp. 742, 749 (D.N.M. 1994); Tanberg v. Weld County Sheriff, 787 F.Supp. 970, 972-73 (D. Colo. 1992). In addition, compensatory damages can be awarded in Rehabilitation Act cases for failure to make reasonable accommodation. 42 U.S.C. §1981a(a)(1).

An employer may escape liability for compensatory damages under the Rehabilitation Act in cases involving failure to accommodate, if the employer shows by clear and convincing evidence that it made a good faith effort to accommodate the plaintiff. *Id.* Perkins's right of recovery is not premised entirely on the Court's finding of a failure to accommodate her disability. Nevertheless, the Defendant would be hard-put to allege a good faith effort in this case; the Court found the Defendant acted in a retaliatory manner in response to the Perkins's request for accommodation. *See*, *Memorandum Opinion and Order* (doc. 88) (hereinafter "*Memorandum Opinion*") at 49. Moreover, Perkins is entitled to compensatory damages because the Court, in its *Memorandum Opinion,* at 47, concluded that "Defendant intentionally discriminated against her on the basis of her disability."

Compensatory damages under the statute include "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and

other nonpecuniary losses...." 42 U.S.C. §1981a(b). The sum of the amount of compensatory damages awarded a prevailing plaintiff cannot exceed $300.000 in the case of a respondent having over 500 employees. 42 U.S.C. §1981a(b)(3)(D). The United States Department of Veterans Affairs, as Perkins's former employer, has had more than 500 employees at all times relevant to this action. Therefore, the compensatory damages cap in this case is $300,000.

However, the cap is exclusive of backpay, interest on backpay, or any other type of relief authorized under section 706(g) of the Civil Rights Act of 1964. 42 U.S.C. §1981a(b)(3). This point is well settled, as the U.S. Supreme Court observed:

> Before the enactment of the 1991 Act, Title VII afforded only "equitable" remedies. The primary form of monetary relief available was backpay... Title VII's back pay remedy... is a "make whole" remedy that resembles compensatory damages in some respects...However, the new compensatory damages provision of the 1991 Act is "in addition to," and does not replace or duplicate, the backpay remedy allowed under prior law. Indeed, to prevent double recovery, the 1991 Act provides that compensatory damages "shall not include backpay, interest on backpay, or any other type of relief authorized under section 706(g) of the Civil Rights Act of 1964." §102(b)(2).

Landgraf v. USI Films, 511 U.S. 244, 252-53 (1994). *See also*, Enforcement Guidance: *Compensatory and Punitive Damages Available under [section] 102 of the Civil Rights Act of 1991*, EEOC Notice No. N915.002 (July 14, 1992).

In its *Memorandum Opinion* the Court found that Perkins was an excellent attorney for the VA who suffered from major depression and dysthymia. (Findings of Fact ("FF") Nos. 6, 13-17). Despite her strong professional reputation (FF No. 33) and exceptional legal work (FF No. 25), Perkins's co-workers and supervisors engaged in

conduct toward her that demonstrated "an ignorance of mental illness and an unwarranted fear of persons who suffer therefrom." (FF No. 213). Perkins's co-workers fostered and encouraged a climate of hostility toward her. (FF No. 111, 152-53).

The Court found that Defendant's agents engaged in a "course of outrageous conduct . . . that mocked Perkins and her mental illness and ultimately fostered and created a climate of hysteria and co-worker hostility in the workplace." *Memorandum Opinion* at 2. The Court further found Defendant's conduct to be "egregious," "irrational," and "retaliatory." *Id.* at 2-3. Defendant's agents were content to remain ignorant of and hostile toward Perkins's mental illness, despite their proximity to those (such as VA Psychiatrist David Graeber, M.D.) with the expertise to advise them regarding it. (FF. Nos. 141-143).

Perkins's emotional distress was acutely caused by the hostile actions of her co-workers and supervisors. The Court has already held that Defendant's actions exacerbated her illness, humiliated her, embarrassed her, and caused her to suffer emotional distress. (FF No. 70). Upon learning of her co-workers' actions, Perkins's visits to Dr. Schwarz increased and she was forced to take leave without pay. (FF. No. 76). The distress caused her to take leave without pay from December 12, 2000 through March 26, 2001. Because Perkins's legal practice focused primarily on her expertise in employment law, Defendant's actions were all the more emotionally harmful to her and the apparent and persistent violations were particularly acute. Dr. Schwarz testified that the "realization that she had been targeted" caused Perkins to feel she was unable "to go on." (FF No. 77). As Norma Murchison testified, at least one manager at the VA Medical Center served by Perkins had heard that Perkins was going to be fired.

Additional distress occurred when Plaintiff was banished from her workplace until such time as she withdrew her request for accommodation. (FF Nos. 207-08; *Memorandum Opinion* at 52, n. 5). The coercive nature of these circumstances cannot be overstated. Thus, the effect of Defendant's discrimination and retaliation manifested in Perkins's continued pain and suffering. Perkins, devastated by the acts of her co-workers and supervisors, took a job as an administrative law judge in Kentucky in October 2001. The evidence in the record supports the conclusion that Perkins's emotional distress, suffered as a result of Defendant's actions, continued in Kentucky and included stressors involved with moving, adjusting to a new job, and continuing to cope with residual effects of Defendant's discriminatory and retaliatory actions. Deposition of Sharon Burnside, M.D., 20:24-21:11, 23:22-24:8, 28:22-29:9, 34:4-25 (attached hereto as Exhibit 1).

The Court has concluded that Defendant's actions were not merely technically or inadvertently discriminatory, but intentionally and outrageously so. Perkins's suffering directly and acutely stemmed from the actions of Defendant. Accordingly, Perkins requests the Court to award her an appropriate amount of damages to compensate her for emotional distress, pain, and suffering.

## II. PLAINTIFF IS ENTITLED TO BACKPAY WITH INTEREST FOR THE PERIOD DURING WHICH SHE TOOK LEAVE WITHOUT PAY.

The Court's Findings of Fact comprehensively sets forth the chronology of animosity manifested by Defendant's agents. Of particular import to the issue of backpay damages is the Court's finding that Jeanne Morris's December 11, 2000 e-mail to Perkins's psychiatrist, Dr. Carol Schwarz, "and its references to [Perkins] as exhibiting

manic behavior and implying she posed a danger to herself and her co-workers" *devastated* Perkins, bringing about an episode of major depression, exacerbating her mental illness, and causing her emotional distress. (FF. Nos. 69-70). From December 12, 2000 through March 26, 2001, Perkins was on leave without pay. *Joint Stipulation of Fact* (doc. 92) ¶1. The leave without pay taken by Perkins was a direct result of the exacerbation of her illness caused by Defendant's agents.

An award of backpay is an equitable remedy authorized under Title VII of the Civil Rights Act of 1964, and applicable to actions against the federal government as employer under the Rehabilitation Act. 42 U.S.C. 2000e-5(g)(1), 29 U.S.C. § 794a(a)(1). *See*, Consolidated Rail Corporation v. Darrone, 465 U.S. 624, 630, n. 1 (1984) (construing and distinguishing sections 504 and 501 of the Rehabilitation Act of 1973). Furthermore, in a case involving disability discrimination under the ADA, the 10th Circuit has held that a district court's decision to award back or front pay is an equitable one:

> As an equitable consideration, "a district court has broad discretion in fashioning relief to achieve the broad purpose of eliminating the effects of discriminatory practices and restoring the plaintiff to the position that she would have likely enjoyed had it not been for the discrimination." Dilley v. SuperValu, Inc., 296 F.3d 958, 967 (10th Cir. 2002) (quotations and alterations omitted).

Bartee v. Michelin North America, Inc., 374 F.3d 906, 910-11 (10th Cir. 2004) (citing 42 U.S.C. 2000e-5(g)(1), and McCue v. Kansas, 165 F.3d 784, 791-92 (10th Cir. 1999) (interpreting back and front pay to be equitable remedies under §2000e-5(g)(1) in a Title VII case )). Such awards are calculated in accordance with the Back Pay Act. 5 U.S.C. § 5596. In pertinent part, the Back Pay Act, 5 U.S.C. § 5596, provides:

(b)(1) An employee of an agency who, on the basis of a timely appeal or an administrative determination (including a decision relating to an unfair labor practice or a grievance) is found by appropriate authority under applicable law, rule, regulation, or collective bargaining agreement, to have been affected by an unjustified or unwarranted personnel action which has resulted in the withdrawal or reduction of all or part of the pay, allowances, or differentials of the employee-

(A) is entitled, on correction of the personnel action, to receive for the period for which the personnel action was in effect--

(i) an amount equal to all or any part of the pay, allowances, or differentials, as applicable which the employee normally would have earned or received during the period if the personnel action had not occurred, less any amounts earned by the employee through other employment during that period; . . . .

. . . .

(2)(A) An amount payable under paragraph (1)(A)(i) of this subsection shall be payable with interest.

(B) Such interest--

(i) shall be computed for the period beginning on the effective date of the withdrawal or reduction involved and ending on a date not more than 30 days before the date on which payment is made;

(ii) shall be computed at the rate or rates in effect under section 6621(a)(1) of the Internal Revenue Code of 1986 during the period described in clause (i); and

(iii) shall be compounded daily.

*See also,* 5 C.F.R. §§ 550.803 - 550.806 (implementing regulations). 26 U.S.C. §6221(a)(1) of the Internal Revenue Code provides that interest be calculated in the following manner:

(a) General rule.--

(1) Overpayment rate.--The overpayment rate established under this section shall be the sum of--

(A) the Federal short-term rate determined under subsection (b), plus

(B) 3 percentage points (2 percentage points in the case of a corporation).

To the extent that an overpayment of tax by a corporation for any taxable period (as defined in subsection (c)(3), applied by substituting "overpayment" for "underpayment") exceeds $10,000, subparagraph (B)

7

shall be applied by substituting "0.5 percentage point" for "2 percentage points".

Plaintiff's Trial Exhibit No. 17, page 213 (attached hereto as Exhibit 2 for the Court's convenience) sets forth that during the period of Perkins's leave without pay (December 12, 2000 through March 26, 2001) Perkins's salary was $77, 501 *per annum* through January 13, 2001 and, effective January 14, 2001, her rate was $80, 267 *per annum*. Perkins is entitled to compensation for backpay at this rate for the time she was on leave without pay during this period, plus interest at the Internal Revenue Code rates set forth above.

Additionally, Perkins is entitled to an amount equal to 5% of her salary that, but for her having to take leave without pay, would have been contributed by the Agency to her Thrift Savings Plan. Because Perkins was in a non pay status, she was unable to contribute to the Thrift Savings Plan, which is part of her retirement package through the Federal Employees Retirement System ("FERS"). Page 187 of Plaintiff's Exhibit No. 17 (attached as Exhibit 3 hereto) demonstrates that Perkins had made the maximum *voluntary contribution* of 11% of basic pay (pre-tax), into the Thrift Savings Plan before December 12, 2000, pursuant to 5 USC §8432(a)(2).[2] In addition, Defendant was not making the *automatic contribution* equivalent to one percent of Perkins's salary. *See*, 5 U.S.C. §8432(c)(1). Furthermore, Perkins was unable to make her voluntary maximum contribution into the Plan. Because of that, the Defendant was not *matching* Perkins's contribution at the maximum rate of an additional 4% of her pre-tax earnings. *See*, 5 U.S.C. §8432(c)(2). Thus, Perkins suffered an additional total loss of 5% of her pre-tax earnings, as well as the interest and tax savings she would have derived through her

---

[2] The maximum amount Perkins was contributing was 11%, as it changed from 10% (the percentage listed in Ex. 3) on October 1, 2000, to 11%, per the statute cited.

8

voluntary contribution, calculated on 11% of her pre-tax earnings. Therefore, Perkins is entitled to the sum of these amounts, plus interest at the Internal Revenue Code rate for the time she was on leave without pay.

Finally, because Perkins was in a non-pay status, she did not accrue annual and sick leave during that period. Immediately prior to December 12, 1000, she accrued annual leave at a rate of 8 hours per 2-week pay period, pursuant to 5 U.S.C. §6303(a)(3), and sick leave at 4 hours, pursuant to 5 U.S.C. §6307(a), when in pay status. This is reflected in Notification of Personnel Action forms ("SF-50") in her Official Personnel Folder, Plaintiff's Exhibit No. 17, in Block numbered 31, "Service Comp. Date (Leave)". (Exhibit 2). Thus, Defendant's actions deprived her of approximately 7.5 pay periods' worth of leave accrual, i.e., 60 hours of annual leave and 30 hours of sick leave.

Plaintiff acknowledges that as a "FERS" employee, she would not be entitled to the cash value of accrued sick leave on separation from federal government service, whereas she would be entitled to the cash value of accrued annual leave. However, Perkins is still in government service, though not with the Defendant agency. Furthermore, any opportunity the Defendant had to re-credit Perkins's leave bank with minimum inconvenience to her has passed: her Official Personnel Folder is no longer in Defendant's custody. Therefore, the Plaintiff requests that the court exercise its equitable powers in this regard and simply award the monetary equivalent of the sick leave she lost, in addition to that of her lost annual leave, plus interest at the Internal Revenue Code rate for the time she was on leave without pay.

## RELIEF REQUESTED

Wherefore, for the reasons set forth above and in the Court's *Memorandum Opinion*, Perkins respectfully requests that the Court award her compensatory damages for emotional distress, pain and suffering and backpay for her leave without pay taken from December 12, 2000 through March 26, 2001, plus interest, and to award such further relief as the Court deems appropriate. The necessary damages calculations are a ministerial task based on information in Defendant's possession, Plaintiff respectfully requests the Court to order Defendant to calculate the damages and to pay Perkins accordingly, in order to make her whole.

Respectfully submitted,

Justin Lesky
Law Office of Justin Lesky
108 Wellesley Drive SE
Albuquerque, NM 87106
(505) 266-4335, (505) 266-1915 (fax)

Attorney for Plaintiff

Certificate of Service:

The foregoing was served on all counsel of record this 12th day of August 2005.

Justin Lesky



IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

BARBARA L. PERKINS,

    Plaintiff

v

ANTHONY J. PRINCIPI,
Secretary of Veterans Affairs,

    Defendant

Civil Action No.
02-1392 MCA/WWD

DEPOSITION OF SHARON RENEE BURNSIDE, M.D.

December 2, 2003

Reporter: Patricia E. Stooksbury
BROWN & WINGO COURT REPORTING
(423) 524-2841



EXHIBIT 1

```
 1        Q         Do you know if anything has been done
 2   to assist her in being able to perform her job and then
 3   whether she has undertaken something on her own, some kind
 4   of assistance or accommodation or whether her employer has
 5   given her anything to assist her in performing her job?
 6        A         I am unaware of this.
 7        Q         With respect to her prognosis, what is
 8   that?
 9        A         Her depression has been very chronic.
10   She had an episode, I think, at a young age of depression,
11   and then she has been in treatment for at least 10 years.
12   And since that time I think that she has been on several
13   different anti-depressants, and I think that this is
14   probably going to be a long-term battle for her.
15        Q         I understand it's probably difficult
16   to generalize among patients with this kind of diagnosis,
17   but just as a general matter when somebody carries this
18   kind of diagnosis, is it expected that they will probably
19   have it throughout life then?
20        A         It's a recurrent illness, and
21   frequently people relapse. She has had some episodes of
22   improving, but her disposition has never gone into full
23   remission since I have been treating her.
24        Q         In reviewing your notes, you
25   identified several stressors in her life. Can you identify
```

```
 1  those again.  If you need to look at your records you can.
 2          A        Yes, sir.  I think it has been
 3  difficult to move to northern Tennessee, southeastern
 4  Kentucky from New Mexico.  I think the weather changes have
 5  effected her.  In discussing that seasonal component to her
 6  depression previously, I guess the less sunlight that we
 7  have here has affected her somewhat, but I think that she
 8  feels that that has made her depression worse, as well as
 9  the fact that her husband has not been pleased with the
10  move and he, I think, misses where they previously lived.
11  That's been one of the major things that we have discussed.
12          Q        Is it recognized in the field of
13  psychiatry that a move, in this case, across the country
14  would rate higher on the level of stressors for people?
15          A        Can you rephrase.
16                   MR. BACH:  I object as vague.  I mean,
17          higher than what?
18          Q        And, Doctor, forgive me because I'm
19  not a psychiatrist at all, but I'm aware that -- I have
20  seen lists of stressors, life stressors basically, you
21  know, death of a parent, a job loss, health issues are
22  common stressors.  Is making a move of this type, is that
23  considered a significant stressor as a general matter?
24          A        I think moves are generally stressors
25  regardless for most people.
```

```
 1        Q         47-year-old, is it middle aged white
 2   female?
 3        A         Married white female.
 4        Q         Married white female, works as judge in
 5   Kentucky who has had stressors in mother-in-law; is that
 6   right?
 7        A         Yes, sir.
 8        Q         Has been moved in with the --
 9        A         Sister-in-law.
10        Q         And then her father-in-law is
11   diagnosed with Alzheimer's disease and is refusing to move
12   out of the home.
13        A         Yes, sir.
14        Q         Then the father is incompetent yet APS?
15        A         Yes, sir.
16        Q         What is APS?
17        A         Adult Protective Services.
18        Q         And is not doing much work to get him
19   into a safe environment.  So these are also stressors that
20   you identified?
21        A         Yes, sir.
22        Q         I guess another stressor would be
23   changing jobs; is that true in your mind?
24        A         Yes, sir.
25        Q         On page 1 of your records you noted in
```

```
 1   the social history that she took a job in 10-01 as a Social
 2   Security judge and gained 20 pounds, put her up to 180.
 3            A         Uh-huh.
 4            Q         So this weight gain, is that associated
 5   with her change in jobs?
 6            A         Yes.  I was just basically taking
 7   notes, as that was one of her social stressors at the time.
 8   I didn't mean to correlate the two.
 9            Q         On page 3 of your notes -- it actually
10   might be helpful if we could just go through and if you
11   could explain the form that you use so that I can
12   understand basically how you were evaluating Ms. Perkins.
13   And what I'm interested in is just explaining some of the
14   acronyms, like OCD and GAD.
15            A         Yes, sir.  The notes that you have in
16   front of you are the notes that I use for all of my
17   patients; basically has my name and identifying information
18   and it's basically listed as a Psychopharmacological
19   Management Session, which is what we refer to in psychiatry
20   as medication management.  The patient's name and then the
21   subjective where I leave five lines to write information is
22   basically what the patient comes in telling me as their
23   current stressors, issues that they've been dealing with
24   between my current appointment and their previous
25   appointment.
```

1  further back you were describing global assessment --
2      A      I think it's -- I would have to
3  actually look it up. I always call it a GAF score. But
4  there is a table in the DSM IV which relays how the
5  patient's functional capacity is in their day-to-day
6  living. And it's Global Assessment of Functioning scale,
7  is the actual scale name.
8      Q      What I'm getting what at is, where the
9  70 falls on page 3, you have given her a 70, is that slow
10 or above normal?
11     A      That's a pretty good score for me to
12 score someone with a 70. That typically means that they
13 are functioning at an above average capacity in light of
14 their illness.
15     Q      Just help me to understand. Somebody
16 that is healthy and doesn't have any mental health
17 problems, what would their score be; would that be 100
18 percent then?
19     A      I don't know that I have ever met
20 anyone that can score a hundred on that. I would say
21 probably 85 to 90 is as high as I would go.
22     Q      With respect to -- actually let me
23 have you turn to page 7 of your records were we talked
24 about her current stressors. You would also include her
25 job as a stressor; is that correct?

1   A   Yes, sir.
2   Q   And you mentioned in this note that job
3 has remained stressful with poor lack of work ethics; is
4 that correct?
5   A   That's what she was seeing within the
6 community that she had moved to. It was difficult to find
7 people to work with who respected their job or would put in
8 the hours that they needed to be working. So that's what I
9 was meaning with that statement.
10   Q   Also in this note you indicate that she
11 has put in for a job in Colorado Springs and wants to be
12 transferred there?
13   A   Yes, sir.
14   Q   Page 8, you indicate in your
15 subjective portion, the last sentence there, the husband is
16 miserable in their current location; is that correct?
17   A   Yes, sir.
18   Q   And that basically is what she is
19 reporting to you then?
20   A   Yes, sir.
21   Q   Page 10 of your notes you indicated in
22 the subjective portion that patient is a judge who has had
23 recent argument at work with computer personnel; is that
24 correct?
25   A   Yes, sir.

1  that regarding having to fly to New Mexico in January. It
2  brings up a lot of the prior issues for her, which I think
3  have worsened her depression at present.
4      Q    What does she say about the prior work
5  issues; how does she describe them?
6      A    She discussed that mostly at our
7  initial assessment, that there were some issues between
8  her and another attorney at the VA who had what she felt
9  were some narcissistic personality issues, and it
10 was a traumatic experience, from what I recall from our
11 initial assessment, in which she discussed. I wrote in
12 my notes -- in my poor, rapid writing I wrote, defamatory
13 statements, but actually it's deflamatory statements, is
14 what she was relaying regarding this attorney and she was
15 very distraught over not being able to return to their
16 office after they had accused her of being of a threat to
17 others.
18      Q    And then the last question that I have
19 is just a clarification for my knowledge. You mentioned
20 the genetic or organic based depression. Can that kind of
21 depression be exacerbated by situational depression?
22      A    Absolutely. That's very true.
23      Q    Would you believe that to be the case
24 in Ms. Perkins situation?
25      A    Yes, sir.

Standard Form 50-B
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 4

# NOTIFICATION OF PERSONNEL ACTION

644 044

| 1. Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| PERKINS, BARBARA L | 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 | 12-02-54 | 01-14-2001 |

### FIRST ACTION

| 5-A. Code | 5-B. Nature of Action |
|---|---|
| 894 | PAY ADJUSTMENT |
| 5-C. Code | 5-D. Legal Authority |
| QWM | REG. 531.205 |
| 5-E. Code | 5-F. Legal Authority |
| ZLM | E.O. 13182 DTD DECEMBER 23, 2000 |

### SECOND ACTION

| 6-A. Code | 6-B. Nature of Action |
|---|---|
| | |
| 6-C. Code | 6-D. Legal Authority |
| | |
| 6-E. Code | 6-F. Legal Authority |
| | |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| GENERAL ATTORNEY (VETERANS) 03256A | GENERAL ATTORNEY (VETERANS) 03256A |

| 8. Pay Plan | 9. Occ. Code | 10. Grade/Level | 11. Step/Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade/Level | 19. Step/Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| GS | 0905 | 14 | 04 | $77,501 | PA | GS | 0905 | 14 | 04 | $80,267 | PA |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| $72,580 | $4,921 | $77,501 | $0 | $74,542 | $5,725 | $80,267 | $0 |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| VA MEDICAL CENTER GENERAL COUNSEL OFC OF REGIONAL COUNSEL PHOENIX AZ | VA MEDICAL CENTER GENERAL COUNSEL OFC OF REGIONAL COUNSEL PHOENIX AZ |

### EMPLOYEE DATA

| 23. Veterans Preference | 24. Tenure | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|
| 3 | 1 | | YES |
| 27. FEGLI | 28. Annuitant Indicator | | 29. Pay Rate Determinant |
| A0 BASIC + OPTION B (5X) | 9 NOT APPLICABLE | | 0 |
| 30. Retirement Plan | 31. Service Comp. Date (Leave) | 32. Work Schedule | 33. Part-Time Hours Per Biweekly Pay Period |
| K FERS & FICA | 02-05-85 | F FULL-TIME | |

### POSITION DATA

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 2 | E | 1200.6100 | 8888 |
| 38. Duty Station Code | 39. Duty Station (City - County - State or Overseas Location) | | |
| 35-0030-001 | ALBUQUERQUE NM | | |

| 40. AGENCY DATA | 41. | 42. | 43. | 44. |
|---|---|---|---|---|
| | | | | |

45. Remarks

SALARY INCLUDES A LOCALITY-BASED PAYMENT OF 7.68%.



EXHIBIT 8

| Employing Department or Agency | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| DEPARTMENT OF VETERANS AFFAIRS | |
| 47. Agency Code | 48. Personnel Office ID | 49. Approval Date | PERSONNEL OFFICER |
| VA AE | 1797 | 01-12-2001 | |

213

5-Part 50-316

Editions Prior to 7/91 Are Not Usable After 6/30/93

# THRIFT SAVINGS PLAN
## ELECTION FORM

**TSP-1**

Use this form to:
- Start or change your contributions to the Thrift Savings Plan (TSP)
- Stop your contributions to the TSP
- Indicate how you want your future contributions to be invested in the three TSP Funds

Before completing this form, please read the *Summary of the Thrift Savings Plan for Federal Employees* and the instructions on the back of this form. Type or print all information. **Return the completed form to your agency employing office.** Do not remove your copy. Your agency will return it to you after completing Section VII.

## I. INFORMATION ABOUT YOU

1. Perkins / Barbara / Licha
   Name (Last) / (First) / (Middle)
2. 11228 Academy Ridge Rd, NE / Albuquerque, NM 87111
   Street Address / City / State / Zip Code
3. 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
   Social Security Number
4. (505) 256-2780
   Daytime Phone (Area Code and Number)
5. 12/02/54
   Date of Birth (Month/Day/Year)
6. VA Regional Counsel
   Office Identification (Agency and Organization)

## II. AMOUNT OF YOUR CONTRIBUTIONS

*If you complete this section, you must also complete Section IV*

Complete either Part A or Part B of this section.

**Part A.** To contribute to your TSP account, enter either a whole percentage of your basic pay per pay period (Item 7) or a whole dollar amount per pay period (Item 8).

**Part B.** If you are a FERS employee who is not, and will not be, contributing to your TSP account at this time, but you are allocating your Agency Automatic (1%) Contributions, check Item 9.

7. ___10___.0%   OR   8. $ _____.00   9. ☐ (Noncontributing FERS)

## III. STOPPING YOUR CONTRIBUTIONS

*Do not complete Section II. FERS employees must also complete Section IV.*

To stop your contributions to the TSP, check Item 10 and sign and date Items 15 and 16. If you are a FERS employee, your Agency Automatic (1%) Contributions will continue. You must complete Section IV to show how you want these contributions to be divided among the three TSP Funds.

10. ☐ I want to stop contributing to my TSP account. I understand that my payroll deductions will stop at the end of the pay period in which my agency employing office accepts this form.

## IV. ALLOCATING CONTRIBUTIONS

*You must also complete Section II or III*

Show how you want future contributions to your account to be divided among the G, F, and C Funds. Enter the percentage (in multiples of 5%) that you want invested in each Fund. Do not use dollar amounts. The total of Items 11, 12, and 13 must equal 100%. If you are a FERS employee, the percentages that you choose will be applied to all contributions to your account, including Agency Automatic (1%) Contributions and Agency Matching Contributions.

If you invest in either the F or C Fund, you must sign Item 14; otherwise, your form will be returned to you unprocessed.

11. **G Fund** Government Securities Investment Fund — 20.0%
12. **F Fund** Fixed Income Index Investment Fund — 0%
13. **C Fund** Common Stock Index Investment Fund — 80.0%
    **Total** 100.0%

## V. ACKNOWLEDGEMENT OF RISK

*Also sign Section VI.*

I have chosen to invest in the F and/or C Fund. I understand that I am making this investment at my own risk. I also understand that I am not protected by either the U.S. Government or the Federal Retirement Thrift Investment Board against investment loss in the F or C Fund, and that neither the U.S. Government nor the Federal Retirement Thrift Investment Board guarantees a return on my investment.

14. *[signature]*
    Participant's Signature

## VI. SIGNATURE

You must sign Item 15 and date Item 16; otherwise, your form will be returned to you unprocessed.

15. *[signature]*                              16. 5/24/96
    Participant's Signature                        Date Signed

## VII. FOR EMPLOYING

17. 36 00 0200        18. VA 80         19. 7/7/96              20. _____
    Payroll Office Number   Agency Code      Effective Date        TSP SCD (Optional)
21. Rafael Martinez, Chief, Human Resources Mgmt Svc.      22. May 30, 1996
    Signature of Employing Office Official                       Acceptance Date
23. _____                              24. Open Season, Allocation Change.
    New Eligibility Date if Item 10 is Checked    Remarks  FERS Employee



EXHIBIT 3